Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee, JJ., and Lacy, S.J.[1]

JOHN CRANE, INC.

v.  Record No. 062164          OPINION BY SENIOR JUSTICE
                                    ELIZABETH B. LACY
                                  September 14, 2007

WANDA T. JONES, ADMINISTRATRIX
OF THE ESTATE OF GARLAND F. JONES, JR.

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
C. Peter Tench, Judge

Garland F. Jones, Jr. was employed as an outside machinist at Newport News Shipbuilding & Dry Dock Company from 1963 to 1967.  In January 2005, he was diagnosed with malignant mesothelioma, a fatal cancer in the lining of the lung which is caused only by exposure to asbestos dust or fibers.  On March 22, 2005, Garland and Wanda T. Jones filed an amended motion for judgment against John Crane, Inc. (Crane) and other companies, alleging that Crane manufactured and/or sold asbestos-containing products to Garland Jones' employers, and that he was exposed to these products while building and repairing various marine vessels.[2]  The Joneses sought $10

_____

[1]  Justice Lacy participated in the hearing and decision of this case prior to the effective date of her retirement on August 16, 2007.

[2]  In addition to John Crane, the complaint named the following parties as defendants:  Garlock Sealing Technologies, LLC; Dana Corporation; Metropolitan Life Insurance Company; General Electric Company; Foster-Wheeling USA Corporation; Warren Pumps, Inc.; Goulds Pumps, Inc.; Borg-Warner Corporation; Honeywell International, Inc.; Pneumo Abex

million in compensatory damages and $5 million in punitive damages. Garland Jones died in July of 2005. Wanda Jones, as administratrix of the estate of Garland F. Jones, Jr., (the Estate) filed a second amended motion for judgment adding a wrongful death count.

Following a seven day trial, the jury returned a verdict in favor of the Estate awarding $10.4 million in damages. The jury apportioned 34 percent of the damages to Crane, and the remaining 66 percent equally between two other defendant companies. The trial court reduced the damage award to $10 million to conform to the amount sought in the motion for judgment. Crane's damage liability amounted to $3.4 million.

Crane appeals to this Court asserting that the judgment should be reversed and the case remanded on four separate grounds. Crane first assigns error to the trial court's refusal to set aside the jury verdict as excessive. In two other assignments of error, Crane challenges the trial court's evidentiary rulings regarding the testimony of a Crane employee and two of Crane's expert witnesses. Finally, Crane asserts that the trial court should have applied Virginia law, rather than general maritime law. For the following reasons, we

---

Corporation; General Motors Corporation; and Genuine Parts Company. None of these defendants are parties to this appeal.

conclude that there was no error in the challenged rulings and we therefore will affirm the judgment of the trial court.

DISCUSSION

I.  MARITIME LAW

We first address Crane's assertion that the trial court erred in applying general maritime law to the Estate's action.[3] Whether general maritime law applies to this case presents a question of law which we review de novo.

The application of general maritime law has evolved from a simple "location test," under which maritime law "govern[ed] only those torts occurring on the navigable waters of the United States," Victory Carriers, Inc. v. Law, 404 U.S. 202, 205 (1971), to a location and connection test, initially established in Sisson v. Ruby, 497 U.S. 358 (1990), and most recently discussed in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995).  In Grubart, the United States Supreme Court explained that a party seeking to apply maritime law to a case

> must satisfy conditions both of location and of connection with maritime activity.  A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  The connection test raises two issues.  A

---

[3]  Under general maritime law, the Estate was allowed to recover damages for pain and suffering in addition to the damages authorized by Code § 8.01-52 in a wrongful death action.  Sea-Land Servs. v. Gaudet, 414 U.S. 573, 583 (1974).

3

court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

Id. at 534 (internal quotation marks and citations omitted).

As the parties recognize, the location prong of the test is met in this case because the incident giving rise to Garland Jones' injury, inhalation of asbestos, occurred while repairing and constructing ships at the Newport News Shipyards in the James River. However, according to Crane neither prong of the connection test is met because the inhalation of asbestos does not have a potentially disruptive impact on maritime commerce and because Crane's activity in the manufacture of asbestos-containing products did not have a substantial relationship to traditional maritime activity. We disagree.

In applying the first prong of the connection test the impact of the incident is evaluated "at an intermediate level of possible generality" in order to determine whether the incident is "within a class of incidents that posed more than a fanciful risk to commercial shipping." Grubart, 513 U.S. at 538-39 (citations omitted). The disruptive impact need only be potential, not actual. Id.

Applying the test enunciated in Sisson and Grubart, other courts have concluded that exposure to asbestos came within the

4

general category of the risks of unsafe working conditions that have a potential impact on commercial shipping. In Lambert v. Babcock & Wilcox, Co., 70 F.Supp.2d 877, 884 (S.D. Ind. 1999), the court observed that "[u]nsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime commerce." The Lambert Court concluded that "asbestos exposure in the boiler room of a ship – could potentially disrupt maritime commerce by rendering the boiler room too hazardous to operate." Id. See also Bartel v. A-C Product Liability Trust, 461 F.Supp.2d 600, 602 (N.D. Ohio 2006) (claim based on merchant seaman's exposure to asbestos while aboard a vessel was governed under admiralty law); Weaver v. Hollywood Casino-Aurora, Inc., 255 F.3d 379, 386 (7th Cir. 2001) ("[W]ithout doubt an injury to . . . crew [of a "commercial boat"] disrupts its participation in maritime commerce."); Alderman v. Pacific Northern Victor, Inc., 95 F.3d 1061, 1064 (11th Cir. 1996) ("Unsafe working conditions aboard a vessel under repairs, maintenance, or conversion, therefore, pose a potentially disruptive impact upon maritime commerce."); Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1119 (5th Cir. 1995) ("[W]orker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel.").

Accordingly, we conclude that Garland Jones' inhalation of asbestos fibers while engaged in the repair and construction of vessels on navigable waters had the potential to disrupt maritime commerce. Injury to Garland Jones that occurred during these activities could potentially slow or frustrate the work being done on the vessel. Such a result could, in turn, have a disruptive impact on maritime commerce.[4]

The second prong of the connection test – whether the activity giving rise to the incident bears a substantial relationship to traditional maritime activity – requires a definition of the relevant activity "not by the particular circumstances of the incident, but by the general conduct from which the incident arose." Sisson, 497 U.S. at 364. This inquiry demands a "broad perspective." Id. In Grubart, the Supreme Court explained that this inquiry is guided by principles of proximate causation, and that "[t]here is . . . no need . . . for imposing an additional nonremoteness hurdle in the name of jurisdiction." Id. at 538.

We applied these principles in Garlock Sealing Technologies, LLC v. Little, 270 Va. 381, 384-86, 620 S.E.2d 773, 775-77 (2005), and determined that the defendant's acts

_____

[4] We do not address Crane's argument that Garland Jones worked only on new ship construction which does not have a potentially disruptive impact on maritime commerce. The record

6

of omission and commission in manufacturing asbestos-containing material used by Little to create gaskets used on submarines "had a significant connection with maritime activity," and held that maritime law applied.

In the case now before us, Crane urges again that the manufacture and sale of asbestos-containing products into the stream of commerce is too far removed from traditional maritime activities to create the necessary relationship. Again we disagree. The record in this case reflects that during the time Garland Jones was exposed to asbestos-containing products manufactured by Crane, Crane marketed gaskets and packing material directly for the marine industry and advertised its products for "marine engine and general ship use." Crane also advertised its products in publications about maritime activity. This activity bore a substantial relationship to traditional maritime activities. The fact that Crane did not directly undertake any activity aboard a maritime vessel does not obviate this connection.

In summary, for the reasons set out above, we find that the circumstances of this case satisfied both the location and connection tests required under Grubart and therefore, the trial court did not err in applying general maritime law.

---

shows that Garland Jones' exposure to asbestos occurred while working on new vessels and repairing existing vessels.

## II.  TESTIMONY OF TERRENCE MCNAMARA

Crane next asserts that the trial court erred in allowing the Estate to call Terrence McNamara as a witness "solely for the purpose of impeachment, when the substance of his testimony was unchallenged."  McNamara was Crane's custodian of records and the designated corporate representative responsible for reviewing and certifying responses to discovery propounded upon Crane from 2000 until June 2004, including discovery in this case.  A number of Crane's responses to interrogatories, submitted under McNamara's verification, were untruthful.  Over Crane's objection, the trial court allowed the Estate to call McNamara as an adverse witness to impeach Crane's credibility.

Generally, we review a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion. Riverside Hosp. v. Johnson, 272 Va. 518, 529, 636 S.E.2d 416, 421 (2006).  While a "trial court has no discretion to admit clearly inadmissible evidence, a great deal must necessarily be left to the discretion of the court of trial, in determining whether evidence is relevant to the issue or not."  Id., 636 S.E.2d at 421-22 (internal citations omitted).  "Evidence is relevant if it has any logical tendency to prove an issue in a case."  Goins v. Commonwealth, 251 Va. 442, 461, 470 S.E.2d

8

114, 127 (1996).  "[R]elevant evidence may be excluded only if the prejudicial effect of the evidence outweighs its probative value."  Id.

Crane's primary complaint is based on the legal proposition that a party may not impeach his own witness. While we agree that the Estate could not call McNamara for the sole purpose of impeaching him, see Virginia Electric & Power Co. v. Hall, 184 Va. 102, 105-06, 34 S.E.2d 382, 383 (1945), this is not what occurred at trial.  Rather, the Estate argued to the trial court that it intended to call McNamara in order to show the "pattern of untruthful behavior exhibited by John Crane."  Such a pattern, if it existed, was relevant, to a primary issue in the case, whether Crane knew or had reason to know of the health risks posed by the asbestos-containing products it manufactured.  Because McNamara's testimony concerned an improper discovery verification procedure, it tended to undermine the credibility of Crane's assertion that he employed proper procedures with respect to researching the dangers posed by asbestos or to disseminating that information and that Crane was forthcoming with regard to other statements it made.  Thus, McNamara's testimony did have a "logical tendency" to prove an issue in the case, and we cannot say that it was irrelevant.

Crane further argues that, because it conceded that McNamara's actions regarding discovery were improper, McNamara's testimony did not concern any factual issues in the case, but was merely "calculated to inflame the passion and prejudices of the jury."  We reject this argument because first, as stated above, McNamara's testimony was relevant to the issue of Crane's credibility, and thus did concern a factual issue in the case.  Furthermore, the jury's allocation of damages among the defendants belies any argument that McNamara's testimony unduly prejudiced Crane.

Accordingly, we conclude that the trial court did not abuse its discretion in allowing McNamara to testify.

## III.  TESTIMONY OF CRANE'S EXPERTS

In its third assignment of error, Crane argues the trial court erroneously interpreted the disclosure requirement of Virginia Supreme Court Rule 4:1(b)(4)(A)(i) resulting in a dramatic and unfair limitation of the expert testimony of Dr. Victor Roggli and Henry Buccigross.  Rule 4:1(b)(4)(A)(i) states:

> A party may through interrogatories require any other party to identify each person whom the party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

In reviewing the trial court's decision to exclude expert testimony, we apply an abuse of discretion standard.  Tarmac Mid-Atlantic, Inc. v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 465 (1995).

### A.  Dr. Victor Roggli

The trial court sustained the Estate's objection to Dr. Roggli's testimony regarding his opinion on the amount of asbestos in the ambient air and its relationship to the cause of mesothelioma because this opinion was not disclosed pursuant to Rule 4:1(b)(4)(A)(i).  We have not previously examined the degree of specificity required by Rule 4:1(b)(4)(A)(i). Nevertheless, any application of this rule begins with determining whether the opinion at issue was disclosed in any form.  See, e.g., Griffett v. Ryan, 247 Va. 465, 468, 443 S.E.2d 149, 151 (1994) (reviewing trial court decision to allow expert testimony by first examining content of the pretrial disclosure).

Crane made the following pretrial disclosure of Dr. Roggli's testimony:

> Dr. Roggli will testify as to the pathological diagnosis and the testing performed by him and others at Duke University to determine if a mesothelioma exists.  Dr. Roggli may testify as to the association between asbestos (including the various types) and the alleged disease process involving the plaintiff. Dr. Roggli may testify as to the contribution, if any, of exposures to John Crane's products and products of other companies in the causation of

11

plaintiff's asbestos-related disease.  Finally, Dr. Roggli will testify as to the burden of asbestos (including the various types) in plaintiff's lungs and its contribution, if any, in causing plaintiff's asbestos-related disease if any.  Dr. Roggli's reports have already been or will be provided.

Crane subsequently provided the Estate with a report containing the results of Dr. Roggli's examination of tissue samples taken from Garland Jones' lungs.  The report did not contain any reference to levels of asbestos in the ambient air.  Crane argues that in excluding Dr. Roggli's testimony, the trial court interpreted Rule 4:1(b)(4)(A)(i) too strictly.  According to Crane, Dr. Roggli's opinions including those regarding asbestos in the ambient air, were "well known" to the Estate because it questioned Dr. Roggli about the opinions during his deposition.  Thus, even if the disclosures were insufficient, according to Crane, the error was cured at Dr. Roggli's deposition.

Nothing in Crane's disclosure reveals that Dr. Roggli might testify about asbestos in the ambient air.  Furthermore, a party is not relieved from its disclosure obligation under the Rule simply because the other party has some familiarity with the expert witness or the opportunity to depose the expert. Such a rule would impermissibly alter a party's burden to disclose and impose an affirmative burden on the non-

12

disclosing party to ascertain the substance of the expert's testimony.  We reject this reading of Rule 4:1(b)(4)(A)(i).

Accordingly, the trial court did not abuse its discretion in ruling that Dr. Roggli's opinion testimony regarding asbestos in ambient air was inadmissible because Crane failed to comply with the disclosure requirement of Rule 4:1(b)(4)(A)(i).

### B.  Henry Buccigross

Prior to trial, Crane disclosed that Buccigross would offer testimony on, among other topics, his "research and/or his testing of various asbestos insulation products," including "Unibestos" and "Kaylo," as well as his research and testing of Crane products.[5]  Although the disclosure referenced a report by Buccigross on his testing of Unibestos and Kaylo, Crane admitted the report was not attached to the disclosure.  The trial court refused to allow Buccigross to testify about the tests he had conducted on Kaylo and Unibestos products because the Estate had not received Buccigross' report relating to this subject.  Crane assigned error to this ruling.

Crane argues, as it did to the trial court, that regardless of its failure to provide Buccigross' report, the Estate knew the substance of Buccigross' testimony because the

---

[5]  Unibestos and Kaylo were asbestos-containing products of other manufacturers.

13

Estate's counsel had cross-examined Buccigross "at trial about his reports going back to the '90s." Crane also pointed out that the Estate had failed to depose Buccigross or to ask Crane for representative samples of Buccigross' testimony, either of which would have allowed the Estate to ascertain the actual substance of the testimony.

Rule 4:1(b)(4)(A)(i) requires that the substance of opinions to be rendered be disclosed. Here, while Crane did disclose the topic of Buccigross' testimony, Crane did not disclose the substance of Buccigross' opinions in the disclosure or through Buccigross' report. Crane thus failed to comply with the Rule and the trial court did not err by excluding the testimony. As we stated when considering Crane's challenge to the trial court's ruling on the admissibility of Dr. Roggli's testimony, an opponent's ability to depose an expert or familiarity with such expert through prior litigation does not relieve a party from complying with the disclosure requirements of Rule 4:1(b)(4)(A)(i).

Crane also argues that the trial court should have allowed the testimony of both Dr. Roggli and Buccigross because the Estate admitted that the disclosures regarding Roggli and Buccigross were "exemplary, in comparison to Dr. Feingold's," another of Crane's intended expert witnesses.

14

The record shows that the Estate's statement regarding the quality of Crane's disclosures at issue was made as a comparison to the fact that Crane had not disclosed any of the expected testimony of Dr. Feingold.  The statement cannot be fairly taken as a concession that Crane complied with the requirements of the disclosure rule for all purposes.

In summary, we conclude that the trial court did not abuse its discretion in refusing to allow the testimony at issue because Crane did not disclose that Dr. Roggli would render an opinion on asbestos in the ambient air and did not identify the substance of Buccigross' opinion as required by Rule 4:1(b)(4)(A)(i).

## IV.  AMOUNT OF THE VERDICT

Crane asserts that the trial court erred in failing to set aside the verdict because it was excessive when compared to verdicts in similar cases and based on the facts of this case, it was the product of passion and prejudice.

Citing our prior decisions in Chesapeake & Ohio Railway Co. v. Arrington, 126 Va. 194, 101 S.E. 415 (1919), and P. Lorillard Co. v. Clay, 127 Va. 734, 104 S.E. 384 (1920), Crane urges us to compare the verdict in this case to the verdicts rendered in other cases involving similar facts.  Crane acknowledges that this Court has "recently declined to engage in verdict comparison," but argues that the practice of

15

comparing verdicts does not appear to be "foreclosed" in Virginia. In the two cases primarily relied upon by Crane the plaintiffs sought damages for the loss of a limb. In those cases, the Court looked to verdicts in other cases involving the same injury as one part of its determination whether the verdict in the case before it was excessive. Arrington, 126 Va. at 218, 101 S.E. at 423; P. Lorillard, 127 Va. at 756, 104 S.E. at 391.

Since these two cases, however, this Court has routinely rejected the use of an "average verdict rule" in determining whether a verdict is excessive. As early as 1925, in Farris v. Norfolk and Western Railway Co., 141 Va. 622, 126 S.E. 673 (1925), we stated that the rule "cannot be invoked where the injuries are internal, and have produced a condition of greatly impaired earning capacity, continuous pain and suffering, and a dislocated kidney that may or may not produce serious results." Id. at 626, 126 S.E. at 674.

Subsequent cases did not use an "average verdict rule" where issues of pain and suffering were involved. Rather, this Court reviewed the facts and circumstances of each case to determine whether the verdict was excessive and the product of jury passion and prejudice or misapprehension of the case. See, e.g., National Fruit Product Co. v. Wagner, 185 Va. 38, 40-41, 37 S.E.2d 757, 758-59 (1946); Williams Paving Co. v.

16

<u>Kreidl</u>, 200 Va. 196, 204, 104 S.E.2d 758, 764 (1958); <u>Lilley v. Simmons</u>, 200 Va. 791, 797, 108 S.E.2d 245, 249-50 (1959); <u>Edmiston v. Kupsenel</u>, 205 Va. 198, 203, 135 S.E.2d 777, 780-81 (1964); <u>Gazette, Inc. v. Harris</u>, 229 Va. 1, 48, 325 S.E.2d 713, 744-45 (1985) (relying on record to find that verdict bore "no relationship to the loss actually sustained by the plaintiff" and was excessive); <u>Reel v. Ramirez</u>, 243 Va. 463, 467, 416 S.E.2d 226, 228 (1992) ("we examine the record . . . to determine if the trial judge abused his discretion" in granting a remittitur on grounds that verdict was allegedly excessive); <u>Norfolk Bev. Co. v. Cho</u>, 259 Va. 348, 354-55, 525 S.E.2d 287, 290-91 (2000) (analyzing record to determine jury verdict was not excessive); <u>Shepard v. Capitol Foundry of Virginia, Inc.</u>, 262 Va. 715, 720-21, 554 S.E.2d 72, 75 (2001) (analyzing excessiveness of verdict based on the record); <u>Allstate Ins. Co. v. Wade</u>, 265 Va. 383, 394-95, 579 S.E.2d 180, 186-87 (2003) (stating that verdict is excessive when it shocks the conscience of the court and creates impression that jury was improperly motivated or confused, and examining record to determine that verdict was not excessive as a matter of law).

The "average verdict rule" was more recently rejected in <u>Rose v. Jaques</u>, 268 Va. 137, 597 S.E.2d 64 (2004). In that case, the defendants argued the verdict was excessive in light of other verdicts in similar cases. Declining to engage in a

17

comparison, we applied an abuse of discretion standard, based upon the evidence in the record.  Id. at 159-60, 597 S.E.2d 77. See also Government Micro Resources, Inc. v. Jackson, 271 Va. 29, 48-49, 624 S.E.2d 63, 74 (2006).  In sum, the "average verdict rule" is not probative of whether a verdict is excessive; rather that determination must be made based on the facts and circumstances of each case.

In addition to urging us to consider verdicts in similar cases, Crane contends the jury verdict in this case was not related to the evidence presented.  Crane points out that Garland Jones suffered a stroke in 2001, was diagnosed with mesothelioma in January 2005, and died six months later, in June 2005.  According to Crane, these facts and the fact that jury's original award exceeded the damages requested, show that the jury was motivated by passion or prejudice.

We find nothing in the record to support Crane's contention that the verdict was not the product of an impartial decision.  At trial, the Estate produced evidence that medical expenses for Garland Jones totaled $394,857.01 and that his funeral expenses were $9,678.06.  Also admitted was a statement written by Garland Jones in which he stated he was "devastated" to learn he had mesothelioma and described his illness as the "bottom" falling out from underneath him and a "roller coaster ride."  Ashley Higgenbotham, one of Garland Jones' children,

18

testified that after Jones was diagnosed with mesothelioma, he was "barely mobile" and "very depressed," which was uncharacteristic for him. Higgenbotham testified that her father's death in a nursing home was an "absolute nightmare." Michael Jones, another of Garland Jones' children, testified that Garland Jones was in the "best health of his life" and even volunteered for Meals on Wheels after his 2001 stroke. Michael Jones also described how Garland Jones' physical and psychological state deteriorated after his diagnosis and until his death.

The jury also heard evidence that Garland and Wanda Jones had been married for 41 years and were "very loyal to one another" and "loved each other very much." Wanda Jones testified about the pain and sorrow she felt upon her husband's death.

In addition, the jury heard evidence from Dr. G. Dastgir Qureshi, Garland Jones' physician, who testified about mesothelioma in general and about the progression of Garland Jones' disease. Dr. Qureshi testified about the chemotherapy performed on Garland Jones and fact that the chemotherapy eventually caused sepsis and acute renal failure. Dr. Qureshi also testified about several medical procedures undergone by Garland Jones, and described Garland Jones' severely impaired physical state at the time of his death.

The jury was given the following instruction on damages, without objection from Crane:

> If you find for the plaintiff, your verdict shall be in such sum as will fully and fairly compensate such plaintiff for her damages.  In determining damages to which she is entitled you shall include, but are not limited to, any of the following which you believe by the greater weight of the evidence:  One, any pain and suffering of Garland Jones.  Two, any damages for sorrow, mental anguish and solace, which may include loss of society, companionship, comfort, guidance, kindly offices and advice that is suffered by Wanda Jones as a result of the injury and death of Garland Jones.  Three, compensation to Wanda Jones for the reasonably expected loss of the services, protection, care and assistance provided by Garland Jones.  Four, expenses for care, treatment and hospitalization of Garland Jones that are incident to the injury resulting in his death.  And five, reasonable funeral expenses of Garland Jones.

Based on this instruction and the evidence presented at trial, we cannot say the trial court abused its discretion in determining that the verdict was not excessive and not so out of proportion to the injuries suffered as to suggest that it was not the product of a fair and impartial decision.

## V.   CONCLUSION

For the reasons stated above, we will affirm the judgment of the trial court.

<u>Affirmed.</u>