Present:  All the Justices

21ST CENTURY SYSTEMS, INC., ET AL.

                                    OPINION BY
v.  Record No. 110114        JUSTICE DONALD W. LEMONS
                                  June 7, 2012

PEROT SYSTEMS GOVERNMENT SERVICES, INC.

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                       Leslie M. Alden, Judge

     Among the several issues we address in this appeal is

whether the Circuit Court of Fairfax County ("trial court")

erred when, upon a jury's verdict, it awarded Perot Systems

Government Services, Inc. ("Perot") damages for lost goodwill

and other theories against 21st Century Systems, Inc.

("21CSI"), James C. Ballard ("Ballard"), Charles L. Hopkins,

III ("Hopkins"), Charles S. Dellinger ("Dellinger"), and Joseph

Fallone ("Fallone") (collectively, the "Defendants").

                    I. Facts and Proceedings Below

     In August 2009, Perot filed an amended complaint in the

trial court against the Defendants.[1]  Specifically, Perot's ten-

count complaint alleged:

---

     [1] Perot filed its original complaint in June 2009 and, in
addition to those named above, the original complaint named
Gerald F. Hesch ("Hesch"), Patrona Corporation ("Patrona"), and
Joseph C. Novak ("Novak") as defendants.  Perot subsequently
sought and was granted a nonsuit as to Hesch.  The amended
complaint also named Patrona and Novak as defendants; however,
Perot subsequently stipulated, and the trial court ordered,
that the claims against these two defendants be dismissed with
prejudice.

1

Count I     - breach of fiduciary duty against
              Dellinger and Fallone;

Count II    - aiding and abetting breach of
              fiduciary duty against 21CSI, Ballard,
              Hopkins, Patrona, and Novak;

Count III   - breach of non-disclosure agreement
              against Dellinger and Fallone;

Count IV    - breach of non-competition and non-
              solicitation agreements against
              Fallone;

Count V     - tortious interference with contract
              against 21CSI, Ballard, Hopkins,
              Patrona, and Novak;

Count VI    - violations of the Virginia Computer
              Crimes Act, Code § 18.2-152.1 et seq.,
              against Dellinger and Fallone;

Count VII   - violation of Virginia's Conspiracy
              Act, Code § 18.2-499 et seq., against
              the Defendants;

Count VIII  - common law conspiracy to injure
              against the Defendants;

Count IX    - violation of Virginia's Uniform Trade
              Secret Act, Code § 59.1-336 et seq.,
              against the Defendants; and

Count X     - conversion against the Defendants.

Perot alleged that the Defendants, including the individual defendants, all of whom were former Perot employees, conspired for the purpose of "willful[ly] and malicious[ly] attempt[ing] to destroy [Perot] and steal away tens of millions of dollars a year of [Perot] business by unfairly and improperly using [Perot's] confidential and proprietary

2

information" so that 21CSI could establish itself in the United States Navy consulting business. Among other things, Perot sought damages to compensate for the loss of revenue and profits associated with the business misappropriated by the Defendants, damages to compensate for a forensic investigation to determine the extent to which Perot's confidential files and trade secrets had been compromised, and damages for the loss of goodwill. Specifically, Perot sought $10 million in "compensatory, incidental and other actual damages" on all ten counts, with that figure being trebled to $30 million on Perot's statutory business conspiracy claim (Count VII), and $350,000 in punitive damages against the Defendants on all but Counts VI and VII.[2]

Prior to trial, the Defendants moved to strike the testimony of Perot's designated expert, Michael A. Smigocki ("Smigocki"), arguing that "Smigocki's opinions concern matters within the ordinary knowledge of the jury and therefore do not assist the jury's understanding of the facts, and the rest are admittedly so speculative and uncertain that the amount [of damages] cannot be proved with a reasonable degree of certainty." Significantly, Perot and its parent corporation, Perot Systems Corp. ("PSC"), had been sold to Dell, Inc.

---

[2] Perot also sought an award of pre-judgment interest on all ten counts, as well as an award of $3 million in attorneys' fees and costs on Counts VI, VII, and IX.

("Dell") in the fall of 2009, shortly before Smigocki was called upon to analyze Perot's value and goodwill and several months after Perot filed suit in this case. In support of their motion to strike Smigocki's testimony, the Defendants argued that "Smigocki admitted that he does not know whether Dell . . . considered the alleged conduct in its goodwill calculation at the time it purchased [Perot (several] months after the suit was filed)." Accordingly, the Defendants argued, Smigocki's opinions "are by definition the types of speculative and uncertain damages opinions that Virginia law and public policy preclude." The trial court denied the Defendants' motion.

At trial, Smigocki, a certified public accountant and certified valuation analyst, testified for Perot as an expert witness in the fields of "lost profit calculations and goodwill valuation, particularly in the government contracting industry." Smigocki testified that, of the several types of economic damage suffered by Perot as a result of the Defendants' actions, the largest amount of damages results from lost goodwill. Smigocki defined goodwill as "the difference between the fair market value of the company, minus the fair market value of its identifiable assets."

Smigocki testified that the starting point for developing a goodwill calculation is to determine the fair market value of

4

a company.  Smigocki further testified that in conducting the market value method, in which comparable sales of publicly traded companies are used to approximate the value of a particular company, he would typically look for sales of companies comparable to Perot.  He stated that was not required in this case, however, because PSC had actually been sold to Dell, establishing an actual value of the company and eliminating the need to approximate its value based upon comparable sales.

Accordingly, to estimate the goodwill lost as a result of the Defendants' actions, Smigocki examined the actual sale of PSC to Dell in the fall of 2009.  Smigocki subtracted the value of PSC's assets, $1.551 billion, from its sales price, $3.878 billion, to determine the goodwill associated with its sale.  Smigocki concluded that PSC's total goodwill was $2.327 billion.  Smigocki then determined that, of that $2.327 billion in total goodwill, Dell had assigned about $1.6 billion in goodwill to Perot.  All of these figures were reported by Dell in publically available sworn statements submitted to the Securities and Exchange Commission ("SEC").

Smigocki then "spread that goodwill over the contracts of [Perot]," by taking Perot's total annualized revenue, $627 million, and developing "a ratio of that number against the total goodwill number of [$]1.6 billion."  Taking Perot's $1.6

5

billion total goodwill, Smigocki concluded that, "for every dollar of revenue that [Perot] had," his calculation demonstrated "that there was $2.57 of goodwill."

Smigocki testified that, based upon the departed employees' billing rates, Perot lost approximately $1.45 million in revenue "that had gone over to 21CSI as a result of these individuals leaving." Multiplying this lost revenue by the 2.57 ratio described above, Smigocki valued Perot's lost goodwill at $3,742,843. Smigocki also testified that Perot suffered $64,598 in lost profits as a result of the individual defendants' departure, based upon the revenues that the former employees' labor would have generated. However, he testified that these damages were included in his estimate of lost goodwill.

The Defendants again moved to strike Smigocki's testimony at the close of Perot's case-in-chief and at the close of all the evidence, incorporating all of their previous arguments, and arguing that Smigocki's opinion regarding Perot's goodwill was "founded on assumptions that have an insufficient factual basis." The trial court denied the Defendants' motions.

Bruce G. Dubinsky ("Dubinsky"), a certified public accountant and certified valuation analyst, testified briefly for the Defendants at trial as an expert "in commercial damages, business valuations, and general accounting matters

for corporations."  Dubinsky's testimony was offered to demonstrate that Smigocki's opinions regarding damages, particularly lost goodwill damages, are "highly speculative, flawed and unreliable."  The Defendants sought to elicit testimony from Dubinsky related to: (1) the "discounted cash flow method" of valuing goodwill; (2) the problem with Smigocki's "attempt to try to quantify the loss of goodwill related to a customer relationship"; (3) certain "allowable costs"; and (4) an "expected productive hours calculation" relating to certain of Smigocki's damages testimony.  Perot objected to such testimony, however, citing <u>John Crane, Inc. v. Jones</u>, 274 Va. 581, 591-92, 650 S.E.2d 851, 856 (2007), and arguing that Dubinsky's pretrial expert report did not disclose any opinion as to these various topics.  The trial court sustained Perot's objections.

The jury returned a verdict in favor of Perot on all claims, and awarded Perot:

    Count I    - $217,800 in compensatory damages and
                 $217,800 in punitive damages against
                 both Dellinger and Fallone;

    Count II   - $64,598 in compensatory damages and
                 $64,598 in punitive damages against
                 21CSI, and $32,299 in compensatory
                 damages and $32,299 in punitive damages
                 against both Ballard and Hopkins;

    Count III  - $217,800 in compensatory damages
                 against both Dellinger and Fallone;

                Count IV   - $16,916 in compensatory damages
                             against Fallone;

                Count V    - $64,598 in compensatory damages and
                             $64,598 in punitive damages against
                             21CSI, and $32,299 in compensatory
                             damages and $32,299 in punitive damages
                             against both Ballard and Hopkins;

                Count VI   - $217,800 in compensatory damages and
                             $217,800 in punitive damages against
                             both Dellinger and Fallone;

                Count VII - $4,113,845 in compensatory damages,
                             trebled to $12,341,535, against the
                             Defendants;

                Count VIII - $4,113,845 in compensatory damages
                             and $12,341,535 in punitive damages
                             against the Defendants;

                Count IX   - $4,113,845 in compensatory damages
                             and $4,113,845 in punitive damages
                             against 21CSI, and $1,028,461 in
                             compensatory damages and $1,028,461 in
                             punitive damages against each of the
                             individual defendants; and

                Count X    - $12,920 in compensatory damages and
                             $25,840 in punitive damages against
                             each of the Defendants.

     Following the jury's verdict, the Defendants moved to "Set

Aside the Verdicts and Strike the Counts or, in the

alternative, for Mistrial or Remitt[it]ur," arguing that Perot

"failed to prove its damages by using a proper method or

factual foundation," the "jury's verdict form calculations show

duplicative recovery," and the "duplicative damages must be

eliminated, goodwill damages struck, and [certain other]

damages reduced such that they reflect damages actually

                                    8

incurred by Perot as a result of Defendants' conduct."  The trial court denied the Defendants' motion to set aside the verdict but it granted the Defendants' motion for remittitur, in part, and struck the duplicative awards of damages by the jury.

The trial court awarded Perot: (1) $16,916 on Perot's breach of non-competition and non-solicitation agreements claim (Count IV) against Fallone; (2) $4,113,845 in compensatory damages (consisting of $3,742,843 in lost goodwill damages and $371,002 in computer forensics damages), trebled to $12,341,535, jointly and severally, against the Defendants on Perot's statutory business conspiracy claim (Count VII); and (3) $350,000 in punitive damages against each of the defendants on Perot's trade secrets claim (Count IX).  The trial court also awarded Perot $547,541.27 in attorneys' fees in connection with Perot's statutory business conspiracy claim (Count VII), and $861,336.29 in attorneys' fees in connection with Perot's trade secrets claim (Count IX).

The Defendants timely filed their notice of appeal, and we granted an appeal on the following assignments of error:

1.  The trial court committed error when it abused its discretion and permitted Plaintiff's expert witness to give opinion testimony based on a model of goodwill damages that was unprecedented in Virginia and that was unsupported by the evidence.

9

2. The trial court committed error when it abused its discretion and it failed to permit Defendants' expert to present rebuttal testimony on the model of goodwill damages that was unprecedented in Virginia and that was unsupported by the evidence.

3. The trial court committed error when it failed to set aside the damages based upon the model of goodwill damages that was unprecedented in Virginia and that was unsupported by the evidence, even if viewed in the light most favorable to Plaintiff.

4. The trial court committed error when it failed to set aside the jury verdict awarding duplicative trebled and punitive damages.

5. The trial court committed error when it failed to set aside damages that were costs of litigation.

## II. Analysis

### A. Standard of Review

"Generally, [this Court] review[s] a trial court's decision to admit or exclude evidence using an abuse of discretion standard and, on appeal, will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion." Avent v. Commonwealth, 279 Va. 175, 197, 688 S.E.2d 244, 256 (2010) (quoting John Crane, Inc., 274 Va. at 590, 650 S.E.2d at 855). Additionally, "[w]here the trial court has declined to strike the plaintiff's evidence or to set aside a jury verdict, the standard of appellate review in Virginia requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the

10

plaintiff." Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009) (quoting Bitar v. Rahman, 272 Va. 130, 141, 630 S.E.2d 319, 325-26 (2006)).

> A trial court is authorized to set aside a jury verdict only if it is plainly wrong or without credible evidence to support it. This authority is explicit and narrowly defined.
>
> Trial court judges must accord the jury verdict the utmost deference. If there is a conflict in the testimony on a material point, or if reasonable people could differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given to the testimony, the trial court may not substitute its conclusion for that of the jury merely because the judge disagrees with the result.
>
> . . . In reviewing the evidence, we will accord the recipient of the verdict the benefit of all substantial conflicts of evidence, and all fair inferences that may be drawn from the evidence.

Bussey v. E.S.C. Rests., Inc., 270 Va. 531, 534-35, 620 S.E.2d 764, 766 (2005) (citations omitted).

B. "Goodwill" Damages and Sufficiency of Evidence of Damages

On appeal, the Defendants argue that the trial court erred both when it allowed Smigocki "to give opinion testimony based on a model of goodwill damages that was unprecedented in Virginia and that was unsupported by the evidence" and when it "fail[ed] to strike Mr. Smigocki's goodwill damages and damages calculations because such calculations were clearly unable to support the jury's verdict."

11

To the contrary, Perot argues that "Smigocki's calculation of lost goodwill damages mirrored that upheld by this Court in Advanced Marine [Enters. v. PRC Inc., 256 Va. 106, 501 S.E.2d 148 (1998)]." Accordingly, Perot argues that, in light of our opinion in Advanced Marine, the trial court properly admitted Smigocki's testimony regarding lost goodwill damages and properly refused "to strike the evidence concerning Perot's damages in the form of lost goodwill." We disagree with Perot.

Any entity injured as the result of a conspiracy to injure its business may recover the damages sustained because of that conspiracy. See Code § 18.2-500. Damages for loss of goodwill may be recovered if proven. We have previously stated that goodwill "is one of those intangible assets of an established business difficult to describe and impossible of valuing with mathematical precision, but . . . of very real existence and of substantial value." Wood v. Pender-Doxey Grocery Co., 151 Va. 706, 712, 144 S.E. 635, 637 (1928). Significantly, however, we have also recognized that, "[i]t is obvious that its value in a given case, would be of no great assistance in assessing it in other cases where the facts and circumstances were dissimilar." Id.

In affirming an award of damages for lost goodwill as the result of a conspiracy to damage a business, we have recognized that "the market value approach [is] a frequently-used method

12

for computing goodwill damages [and goodwill] is based on the difference between the price a business would sell for and the value of its non-goodwill assets."  Advanced Marine, 256 Va. at 120, 127, 501 S.E.2d at 156, 160.  In Advanced Marine, the plaintiff's expert witness testified that the plaintiff company suffered lost goodwill damages as a result of the departure of its employees to the defendant company and defined "goodwill as the excess of the sales price of a business over the fair market value of the business' identifiable assets."  Id. at 114, 501 S.E.2d at 153.  The facts of this case are distinguishable, however, from those in Advanced Marine and, accordingly, our decision in Advanced Marine is not controlling here.

In Advanced Marine, the plaintiff company announced it would be sold to another company sixteen days before the relevant employees resigned.  Id. at 111, 113, 501 S.E.2d at 151-52.  Advanced Marine made secret job offers to every member of the plaintiff company's marine engineering department, coordinated their simultaneous immediate resignations, and had those employees transfer confidential and proprietary information in an attempt to secure all marine engineering business done by the plaintiff company.  See id.  The record further demonstrated that the sale of the plaintiff company was completed between the time when the employees resigned and the

time when the chancellor decided that case.  See id. at 121, 501 S.E.2d at 157 (stating that "the record shows that the price for the sale of [the plaintiff company] did not change after the departure of the [relevant] employees").  However, unlike this case, the expert witness in Advanced Marine did not look to the sale of the plaintiff company to determine its lost goodwill damages; rather, the expert witness analogized the improperly taken business to the sale of that business and "utilized a variation of [the market value] approach by determining the value of goodwill associated with comparable sales [of businesses] and adjusting [those] figure[s] to approximate [the plaintiff company's] lost goodwill caused by the departure of the [relevant] employees."  Id. at 120, 501 S.E.2d at 156.

Specifically, "[t]o estimate the lost goodwill associated with the departure of the [plaintiff company's employees, the expert witness] examined two sales of comparable businesses."  Id. at 114, 501 S.E.2d at 153.  The expert witness then "subtracted the value of each 'comparable company's' assets from its sales price to determine the goodwill associated with each comparable sale."  Id.  To adjust the loss of goodwill in the comparable sales to account for the differing numbers of employees involved, the expert witness then "apportioned the estimated goodwill figure for each of the two comparable

14

businesses among the total number of employees involved in each transaction."[3]  Id. at 115, 501 S.E.2d at 153.  "This calculation yielded a ratio or percentage that [the expert witness] applied to calculate the goodwill lost by [the defendant company's] acquisition of the [plaintiff company's] employees."  Id.

Relying upon the comparable prior sale of part of the plaintiff's own business and another comparable sale as an appropriate and accurate measure of the plaintiff company's lost goodwill, the chancellor accepted the plaintiff's expert witness' methodology for calculation of goodwill damages and awarded the plaintiff damages.  Id. at 120-21, 501 S.E.2d at 156-57.  The defendant company in Advanced Marine argued that the chancellor "failed to consider that . . . the price for the sale of [the plaintiff company] did not change after the departure of the [relevant] employees."  Id. at 120, 501 S.E.2d at 156.  Significantly, however, we affirmed the award of lost goodwill damages stating that, "[a]lthough the record shows that the price for the sale of [the plaintiff company] did not change after the departure of the [relevant] employees, [the expert witness] emphasized that the departing group [of employees] had goodwill value for purposes of maintaining the

---

[3] The methodology used was not objected to, although the opposing party objected to the expert's calculations.

15

customer relationships necessary for contract retention." Id. at 121, 127, 501 S.E.2d at 157, 160 (emphasis added). Smigocki provided no such testimony in this case.

Additionally, unlike the expert in Advanced Marine, who determined the value of the plaintiff company's lost goodwill by considering the comparable sale of part of the plaintiff's own business, 256 Va. at 114-15, 120, 501 S.E.2d at 153, 156, Smigocki looked directly to PSC's subsequent sale price and the value of its identifiable assets to determine Perot's goodwill lost as a result of the conspiracy. Specifically, Smigocki valuated Perot's goodwill by using figures reported by Dell to the SEC following its purchase of PSC, namely: (1) the actual sale price of PSC to Dell, $3.878 billion, which sale occurred during the pendency of this litigation and several months after Dellinger and Fallone left Perot; (2) the value of PSC's identifiable assets, $1.551 billion; and (3) Dell's valuation of the goodwill attributable to Perot as PSC's public sector, $1.613 billion.

Because Smigocki and, by extension, Perot relied on PSC's actual subsequent sale to Dell, rather than a comparable sale, Perot was required to demonstrate that its sale price to Dell reflected an actual loss of goodwill as a result of the conspiracy. It failed to do so.

16

The evidence at trial demonstrated that Dellinger left Perot on June 5, 2009, and Fallone left Perot on June 10, 2009. Further evidence demonstrated that Dell's purchase of PSC and Perot was completed in November of 2009. Significantly, however, Perot introduced no evidence at trial demonstrating a diminution in value of either PSC's fair market value or identifiable assets during the relevant time period. Nor did Perot introduce any evidence demonstrating that the sale price of PSC to Dell was affected, negatively or otherwise, by the Defendants' actions in this case. As a result, Perot introduced no evidence demonstrating a diminution in value of its goodwill.

To the contrary, the evidence introduced at trial demonstrated that Dell purchased PSC at a significant premium several months after the Defendants' alleged wrongful conduct. Specifically, Smigocki testified that PSC was a publicly traded company "selling for about $17, $18 a share at the time" Dell purchased PSC, and that Dell purchased PSC for "$30 a share. It was about a 68 percent premium that had been paid over and above what the general marketplace was saying was the value of the company." Perot introduced no evidence at trial explaining how or why Dell decided upon that particular premium. In fact, Smigocki admitted at trial that he had asked to see Dell's analysis concerning the allegations in this case because that

17

analysis would provide Dell's perspective on "why . . . there [was] such a premium that was paid for Perot," but that Dell did not make that analysis available to him. Accordingly, without any evidence demonstrating that the departing employees had goodwill value with regard to the customer relationships necessary to retain contracts and that PSC's actual sale price to Dell was affected in any way by the Defendants' actions in this case, Perot cannot demonstrate that it actually lost any goodwill.

We hold that Perot's evidence, which lacked comparable sales information, was insufficient, as a matter of law, to support an award of lost goodwill damages because of the conspiracy, and we hold that the trial court: (1) abused its discretion when it denied the defense motions to strike Smigocki's testimony regarding his theory of lost goodwill damages; and (2) erred when it refused to set aside the award of damages relating to Perot's lost goodwill.

### C. Punitive and Treble Damages

The Defendants argue that the awards entered in favor of Perot for trebled and punitive damages "represent an impermissible double recovery" because, in Virginia, "trebled damages are punitive." We disagree.

We have previously held that a trial court may award both punitive and treble damages when the awards are "based on

18

separate claims involving different legal duties and injuries." Advanced Marine, 256 Va. at 124-25, 501 S.E.2d at 159. Awarding punitive and treble damages in such circumstances would not be duplicative. See id.

In this case, the awards of punitive and treble damages were based on separate claims involving different legal duties and injuries. Specifically, the trial court stated:

> I conclude that the jury determined that all five defendants were liable for the elements of the claim under the trade secret[s] act claim [Count IX] and the [business] conspiracy claim [Count VII]. And while the plaintiff can recover the compensatory damages only once, the plaintiff is entitled to treble those damages under the [business] conspiracy claim and to recover punitive damages under the trade secret claim to a maximum of the cap.

(Emphasis added.) Accordingly, the trial court found that Perot was "entitled to $12,341,535 against each of the defendants, which is the statutory conspiracy award having been trebled . . . and then $350,000 in punitive damages against each of the defendants."

To prevail in its business conspiracy claim, Perot was required to prove that two or more persons "combine[d], associate[d], agree[d], mutually undert[ook] or concert[ed] together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Code § 18.2-499(A). In

19

contrast, Perot's claim asserting violation of Virginia's Uniform Trade Secret Act does not require such proof and relates solely to the misappropriation of trade secrets. See Code § 59.1-336 et seq. Accordingly, we hold that the award of both punitive and treble damages in favor of Perot does not constitute an impermissible double recovery.

We have previously observed that "[i]t is well-established that 'an award of compensatory damages . . . is an indispensable predicate for an award of punitive damages, except in actions for libel and slander.' " Syed v. ZH Techs., Inc., 280 Va. 58, 74-75, 694 S.E.2d 625, 634 (2010) (quoting Gasque v. Mooers Motor Car Co., 227 Va. 154, 159, 313 S.E.2d 384, 388 (1984)). While the trial court struck the jury's award of compensatory damages related to Perot's trade secrets claim, it did not do so because such damages were unjustified. Rather, the trial court struck those damages as duplicative of other damages awards. Accordingly, the trial court's award of punitive damages in connection with Perot's trade secrets claim was not improper.

### D. Computer Forensics Damages

The Defendants argue that Perot was not entitled to recover as damages fees it paid to Stroz Friedberg, LLC ("Stroz Friedberg"), a computer forensics firm, to conduct a forensics investigation because such fees were "costs Perot incurred

20

litigating this case." Accordingly, the Defendants argue that "[t]he trial court committed error when it failed to set aside damages that were costs of litigation." We disagree.

At trial, Perot's president, Eugene V. Carrick ("Carrick"), testified that the almost simultaneous departures of a number of Perot executives was "[v]ery much out of the ordinary," and, as a result, Carrick "asked [his] team to just make sure that we're not going to lose any proprietary information." It was subsequently discovered that certain individuals, including defendants Dellinger and Fallone, were "exporting or taking large numbers of files off of [Perot's] system and copying them off on to other devices." Carrick specifically testified that because of the discoveries that "a number of key people," including defendants Dellinger and Fallone, "were taking a lot of information and it was happening right after the day of the resign[ations]" and because Perot employee e-mails revealed that employees were "working together and corroborating" to leave Perot, Perot hired Stroz Friedberg to help Perot "figure out what exactly [was] going on."

Shannon Perkins ("Perkins"), a computer forensic examiner for Stroz Friedberg, testified for Perot as an expert in computer forensic analysis. Specifically, Perkins testified that Dellinger copied thousands of files from his desktop computer at Perot to external hard drives and that numerous

21

files with names matching the files from the desktop computer at Perot were later found to have been copied to his computer at 21CSI shortly after leaving Perot's employ.  Perkins further testified that, just as Dellinger had done, Fallone copied hundreds of files from his computer at Perot to an external drive.

In addition to the testimony described above, the trial court admitted into evidence Stroz Friedberg's highly detailed invoices, totaling $371,002, related to the computer forensics investigation it conducted on Perot's behalf.  Significantly, the Defendants did not object to the admission of Stroz Friedberg's invoices into evidence when they were offered.  The Defendants argued to the trial court that the fees paid to Stroz Friedberg were costs of litigation as opposed to damages after the case had been submitted to the jury.

Moreover, the Defendants offered no evidence that would allow the jury to appropriately discount or apportion the damages related to computer forensics in the Defendants' favor; rather, the Defendants merely elicited testimony upon cross-examination that Stroz Friedberg "provided services in connection with this litigation," that "that work was located in the [invoices admitted into evidence]," and that Perot did not "separate those amounts in [their] calculations."  "In the absence of such evidence, the [jury] as the trier of fact would

22

have been required to resort to speculation and conjecture in order to find that [Perot's computer forensics damages calculation] was not the appropriate remedy." Nichols Constr. Corp. v. Virginia Mach. Tool Co., 276 Va. 81, 91, 661 S.E.2d 467, 473 (2008) (affirming an award where the defendant failed to provide the fact finder with the evidence necessary to calculate a discount in its favor). The question of damages was submitted to the jury upon proper instructions, which are not challenged in this appeal, and the jury decided what damages to award Perot.

Accordingly, we hold that the evidence at trial was sufficient to demonstrate that the Defendants' actions caused Perot to initiate the computer forensics investigation and that the trial court did not err when it refused to set aside the jury's award of $371,002 in computer forensics damages in favor of Perot.

### III. Conclusion

We hold that: (1) the trial court abused its discretion when it denied the defense motions to strike Smigocki's testimony regarding lost goodwill damages and, accordingly, the trial court erred when it refused to set aside the jury's award of lost goodwill damages based upon Smigocki's testimony; (2) the trial court did not err when it refused to set aside the jury's award of both punitive and treble damages in favor of

23

Perot; and (3) the trial court did not err when it refused to set aside the jury's award of computer forensics damages.

As recited above, the jury awarded Perot damages for each of the ten counts Perot alleged in its complaint, and the trial court subsequently struck the jury's awards of damages for all but Counts IV, VII, and IX. The trial court also struck the jury's award of compensatory damages related to Perot's trade secrets claim (Count IX) but awarded Perot $350,000 in punitive damages against each of the defendants on that claim. Counts I, II, III, IV, V, VI, VIII, and X are not the subject of an assignment of error and are not before us on appeal.

Accordingly, with regard to Count VII, Perot's statutory business conspiracy claim, we will reverse the trial court's award of $3,742,843 in lost goodwill damages, trebled to $11,228,529, and affirm the trial court's award of $371,002 in computer forensics damages, trebled to $1,113,006, jointly and severally against the Defendants.

With regard to Count IX, Perot's trade secrets claim, we will affirm the trial court's award of $350,000 in punitive damages against each of the defendants.

Additionally, the trial court awarded Perot $547,541.27 in attorneys' fees in connection with Perot's statutory business conspiracy claim (Count VII), jointly and severally against the Defendants, predicated upon an award of $12,341,535

representing lost goodwill and computer forensics damages. However, because that award has been extensively modified, we will remand to the trial court for a reconsideration of the award of attorneys' fees relating to Perot's statutory business conspiracy claim, consistent with this opinion.[4]

Accordingly, we will affirm in part and reverse in part the judgment of the trial court, and we will remand for further proceedings and for entry of a final judgment order consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.

---

[4] The trial court also awarded Perot $861,336.29 in attorneys' fees in connection with Perot's trade secrets claim (Count IX); however, because the awards related to Perot's trade secrets claim have not been modified, and because the Defendants did not assign error to the trial court's awards of attorneys' fees, the award of attorneys' fees relating to Perot's trade secrets claim will stand.

JUSTICE McCLANAHAN, concurring in part and dissenting in part, in which JUSTICE POWELL joins in part.

This case is not distinguishable from Advanced Marine Enters., Inc. v. PRC Inc., 256 Va. 106, 501 S.E.2d 148 (1998), as precedent for Smigocki's calculation of Perot's damages in the form of diminished goodwill. The majority disapproves of Smigocki's calculation because he relied on Perot's actual sale to Dell for his goodwill number rather than comparable sales; and, therefore, the majority requires a higher standard of proof for Perot to establish its damages.

To the extent Dell's post-injury assessment of Perot's goodwill ($1.6 billion) does not, in fact, account for the lost gross revenue wrongfully caused by the defendants, that number would appropriately reflect a pre-injury goodwill baseline figure for calculating the diminution of that figure resulting from defendants' wrongful acts - just like the comparable sales figure used in Advanced Marine. Alternatively, to the extent Dell's post-injury goodwill figure reflects Perot's diminished goodwill resulting from defendants' actions, then Smigocki's calculation of diminished goodwill simply underestimated the damage to Perot's goodwill caused by the defendants.[*] Either

_____

[*] That is to say, under this scenario, Smigocki's multiplier of 2.57 ($1.6 billion in goodwill divided by $627 million in total annualized revenue) for determining Perot's lost goodwill (2.57

26

way, Perot's diminished goodwill was not overstated by Smigocki. Thus, whether or not Dell accounted for that damage in determining the value it placed on Perot's post-injury goodwill was not a material consideration for the trial court in its decision to allow Smigocki's expert testimony.

For these reasons, the trial court did not err when it denied the defendants' motion to strike Smigocki's testimony and refused to set aside the jury's award of damages relating to Perot's diminished goodwill. In holding to the contrary, the majority has assumed the role of finder of fact and expert to justify its reversal of these rulings.

Because I would affirm the trial court's decision to allow Smigocki to testify as he did, I would address defendants' argument that the trial court abused its discretion when it limited the testimony of Dubinsky, defendants' expert witness offered as rebuttal to Smigocki's testimony. In doing so, I would affirm the trial court in preventing Dubinsky from offering testimony related to the four topics at issue in this evidentiary dispute. Based on our holding in <u>John Crane, Inc. v. Jones</u>, 274 Va. 581, 591-93, 650 S.E.2d 851, 856-57 (2007), and its progeny, the trial court did not abuse its discretion

---

multiplied by $1.45 million in lost revenue) could have been larger, thus increasing the amount of Perot's lost goodwill damages, had the larger pre-injury goodwill figure been used as his baseline number (i.e., the numerator) for his calculation.

27

when it excluded Dubinsky's testimony as to those four topics on the ground that defendants' disclosure of his opinions through his expert report, pursuant to Rule 4:1, was insufficient as to those topics.

For the remaining issues on appeal regarding the awards of punitive and trebled damages, and computer forensics damages, in favor of Perot, I concur with the holdings of the majority.


JUSTICE POWELL, concurring in part and dissenting in part.

I disagree with the majority's analysis and result as to the sufficiency of PSC's evidence of goodwill damages. Therefore, I respectfully dissent from the majority decision as it relates to the first three assignments of error. Regarding the remaining assignments of error, however, I join with the majority.

The majority decides as a matter of law that PSC's evidence was insufficient to support an award of lost goodwill damages "[b]ecause Smigocki and, by extension, Perot relied on PSC's actual subsequent sale to Dell, rather than a comparable sale." The majority concludes that in this circumstance "Perot was required to demonstrate that its sale price to Dell reflected an actual loss of goodwill as a result of the conspiracy." When one considers the intangible nature of goodwill, the impossibility of this standard becomes readily

28

apparent.  See Wood v. Pender-Doxey Grocery Co., 151 Va. 706, 712, 144 S.E. 635, 637 (1928) (describing goodwill as "one of those intangible assets of an established business difficult to describe and impossible of valuing with mathematical precision, but . . . of very real existence and of substantial value"). In support of its holding, the majority contends that PSC did not introduce any evidence "demonstrating a diminution in value of either PSC's fair market value or identifiable assets during the relevant time period."  Alternatively, the majority asserts that Perot failed to "introduce any evidence demonstrating that the sale price of PSC to Dell was affected, negatively or otherwise, by the Defendants' actions in this case."  Looking at the basic facts of this case, however, demonstrates the error in the majority's analysis.

It is undisputed that Dell purchased PSC for $3.878 billion.  Approximately six months before the sale was completed, the Defendants left Perot.  There is evidence that when the Defendants left they took approximately $1.45 million in revenue with them to 21CSI.[1]  This, in turn, amounted to a loss of approximately $3,742,843 in goodwill, based on the revenue to goodwill ratio offered by Smigocki.  Thus, in order

---

[1] It is further worth noting that the loss of the six employees who went to work for 21CSI at that time was a "specific loss of an identifiable asset," especially when the revenue generated by those employees is considered.

to reach the conclusion that PSC failed to demonstrate any diminution in value or loss of identifiable assets, the majority necessarily ignores this clearly demonstrated loss of revenue and goodwill.

Similarly, the only logical inference to which this loss of revenue and goodwill leads is that the sale price of PSC was negatively affected.  To hold otherwise would, in effect, mean that PSC failed to prove that Dell did not pay for something it knew it would not receive.  "In reviewing the evidence, we will accord the recipient of the verdict the benefit of all substantial conflicts of evidence, and all fair inferences that may be drawn from the evidence."  Bussey v. E.S.C. Rests., Inc., 270 Va. 531, 535, 620 S.E.2d 764, 766 (2005).  As the only rational inference is that Dell paid only for what it knew it would receive, PSC clearly proved that the sale price of PSC to Dell was negatively affected, at least to some degree, by the Defendants' actions.

Moreover, I do not believe that the facts in the present case are as distinguishable from those presented in Advanced Marine Enters. v. PRC Inc., 256 Va. 106, 501 S.E.2d 148 (1998), as the majority contends.  It is important to note that, with the exception of the fact that Advanced Marine involved the approximate goodwill values of comparable companies, the expert in that case used the exact same methodology to approximate the

30

goodwill values as Smigocki used in the present case.  In
Advanced Marine the expert "subtracted the value of each
'comparable company's' assets from its sales price to determine
the goodwill."  Id. at 114, 501 S.E.2d at 153.[2]  Here, the same
formula was used, only, instead of using the value of a
comparable company, the actual value of PSC's assets ($1.551
billion) were subtracted from its actual sale price ($3.878
billion) to approximate the goodwill value of the entire
company ($2.327 billion).  The only significant difference
between the present case and Advanced Marine is the fact that,
because Perot was only a part of PSC, the entire goodwill value
could not be allocated to Perot alone.  However, as Smigocki
explained, Dell allocated the amount of goodwill to the various
subsidiaries of PSC, including Perot.  In its 10-K report, a
publically available, sworn statement submitted to the
Securities and Exchange Commission, Dell allocated $1.613
billion to Perot (as the "Public" operating part of PSC).
Thus, aside from relying on Dell's allocation of the total
goodwill, there is no difference between the methodology used
to determine goodwill in Advanced Marine and the methodology
used and accepted by the trial court to determine the goodwill
of Perot in the present case.

---

[2] Indeed, this Court endorsed this formula as "a
frequently-used method for computing goodwill damages."
Advanced Marine, 256 Va. at 120, 501 S.E.2d at 156.

31

The only other notable difference between this case and Advanced Marine is that the expert witness in Advanced Marine apportioned the goodwill among the total number of employees involved (i.e. he determined the amount of goodwill per employee).  In the present case, Smigocki apportioned Perot's goodwill based on revenue (i.e. he determined the amount of goodwill per dollar of revenue).  Smigocki explained that this was a more accurate measure of the potential loss of goodwill due to the nature of this case.[3]  We have previously recognized that, due to its intangible nature, the value of goodwill in one case "would be of no great assistance in assessing [its value] in other cases where the facts and circumstances were dissimilar."  Wood, 151 Va. at 712, 144 S.E. at 637.  Along these same lines, it is only logical that slight differences in the methodology are to be expected based on the facts of each case.

Based on the foregoing, and in light of our decision in Advanced Marine, I do not believe that PSC's evidence, including Smigocki's testimony regarding lost goodwill damages, was insufficient, as a matter of law, to support an award of

---

[3] Smigocki's methodology is not obviously flawed. Therefore it was up to the Defendants to provide the fact-finder or judge, as gatekeeper, with enough evidence to find that the use of revenue was irrelevant or otherwise flawed. Having failed to offer such evidence at trial, either through cross-examination or its own expert, the Defendants cannot now attack the validity of Smigocki's approach.

lost goodwill damages.  Accordingly, I would hold that the trial court did not abuse its discretion when it allowed Smigocki to testify regarding lost goodwill damages and did not err when it refused to set aside the award of damages relating to Perot's lost goodwill.[4]

---

[4] As a result of its decision regarding goodwill damages, the majority does not address the Defendants' second assignment of error.  I agree with Justice McClanahan's analysis of that issue.  Accordingly, I would also affirm the trial court's decision to exclude the Defendants' expert on goodwill damages.