COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, Russell and Senior Judge Felton
Argued at Norfolk, Virginia

TANITA EVERETT, S/K/A
 TANITA MONIQUE EVERETT

                                                            MEMORANDUM OPINION[*] BY
v.      Record No. 0857-15-1                          JUDGE WESLEY G. RUSSELL, JR.
                                                                    APRIL 19, 2016

COMMONWEALTH OF VIRGINIA

                    FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                                  Junius P. Fulton, III, Judge

                  (Eric P. Korslund; Korslund & Korslund, P.C., on brief), for
                  appellant. Appellant submitting on brief.

                  Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
                  Herring, Attorney General, on brief), for appellee.


        Tanita Everett, appellant, was convicted in a bench trial of the July 23, 2014 malicious

wounding of Jasmine Harris, attempted malicious wounding of Lamonte Wiggins, two counts of

using a firearm in the commission of those felonies, and conspiracy. On appeal, she contends the

trial court abused its discretion in allowing the Commonwealth to impeach its own witness.

Specifically, appellant argues that the Commonwealth failed to establish a sufficient foundation to

allow the Commonwealth to impeach Harris with prior inconsistent statements, that the

Commonwealth failed to confront Harris with the substance of the alleged prior inconsistent

statements, and that the alleged prior inconsistent statements "were neither injurious nor damaging to

the Commonwealth's case . . . ." Finding that the trial court did not abuse its discretion in allowing

the Commonwealth to impeach Harris with her prior inconsistent statements, we affirm appellant's

convictions.

--------

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." Smallwood v. Commonwealth, 278 Va. 625, 629, 688 S.E.2d 154, 156 (2009) (quoting Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008)).  This principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis, internal quotation marks, and citation omitted).

Harris was a key Commonwealth's witness against appellant and another defendant, Michael Gleaves, a/k/a Seven, involved in the July 23, 2014 incident.[1]  Harris testified against appellant at the preliminary hearing.  In her preliminary hearing testimony, which was later recounted at trial, Harris testified that appellant, after firing a gun into the air, exited a vehicle, and ran toward Harris.  Harris testified that appellant shot in the direction of Harris and Wiggins. Finally, Harris testified that, after she had been shot, appellant directed Gleaves to "Make sure [Harris] is dead."

Harris was scheduled to testify at the trial of appellant's cohort, Gleaves, which had been scheduled for the previous Monday.  Harris did not appear at that trial despite a subpoena for her appearance.

On the day of appellant's trial, the Commonwealth requested a delay to the start of trial because Harris had not arrived.  The trial court granted a fourteen-minute recess to give Harris additional time to arrive.  The trial commenced once Harris arrived.

---

[1] The trials of appellant and Gleaves for these events were not tried simultaneously, but rather, were scheduled to be tried separately.

In her initial trial testimony, Harris testified on direct examination that, during the late evening of July 23, 2014, Harris and Wiggins were walking on 28th Street in the City of Norfolk when Harris saw appellant parking her car. Harris heard gunshots, turned around, and saw appellant shooting into the air while still seated in her car. She also saw Gleaves running towards her. She ran, and then tripped. When she stood up, someone shot her in the leg. A male standing in the nearby bushes asked, "Is she dead? . . . Make sure she dead." Harris then wiped blood from her leg onto her face in order to appear dead. Gleaves approached her, kicked her, and proclaimed, "She dead." Harris stated that appellant only shot her gun into the air and that she never got out of her car.

During this initial direct examination, Harris was at times combative and upset. On multiple occasions she responded to the Commonwealth's questions by stating "no comment." She also attempted to refuse to answer questions by stating: "How you-all gonna make me tell— I don't want to talk about it . . ." and "That don't have anything to do with the case." Eventually, she became so upset that the trial judge had to interject, stating:

> Ms. Harris, I understand emotionally this is difficult for you. And as I understand it from what the Commonwealth has indicated earlier today, it's been a very difficult last couple of months for you. You are here as a witness under subpoena. You have taken an oath to tell the truth. If you need a moment to get yourself together, that's fine. You can take a moment to get yourself together. Would you like to take a moment?

After Harris took a moment, the Commonwealth completed its direct examination of Harris.

Harris' initial direct examination was followed by a brief cross-examination with appellant's counsel focused on confirming that appellant only shot the gun into the air and never fired a gun at Harris.

The Commonwealth then engaged in redirect examination. After a few preliminary questions (mostly about her knowledge of people in the courtroom who were watching her

testify), the Commonwealth asked the trial court to deem Harris a "hostile witness" and to permit the Commonwealth to cross-examine her and, ultimately, to impeach her with her preliminary hearing testimony. The Commonwealth stressed that the variances between her trial testimony and her preliminary hearing testimony had surprised the Commonwealth and injured its case. Appellant responded by arguing that the witness had testified for approximately ninety minutes and, in the opinion of counsel, had "been very open and honest."

The trial court, citing Friend's Law of Evidence in Virginia, determined that Harris had proven adverse to the Commonwealth, specifically finding that "she has, in fact, surprised the Commonwealth regarding her testimony, and has, in fact, proved to be adverse, if you will, *whether by intimidation* or some other reason, so I'm going to allow counsel to proceed . . ." as if conducting cross-examination. (Emphasis added).

The Commonwealth's examination of Harris as a hostile witness began, but there were still indications that Harris was not comfortable. At that point, the trial court called counsel to the bench for a sidebar conference that was not transcribed by the court reporter. At the conclusion of the sidebar conference, the trial court directed the bailiff to clear the courtroom of spectators.

After the courtroom was cleared, the trial court explained the reason for clearing the courtroom on the record. Specifically, the trial court stated:

> Just so the record is clear, based upon *what both counsel ha[ve] determined from speaking with the witness, that there was a person in the courtroom she found threatening and intimidating.* Apparently this person has some connection to the codefendant [Michael Gleaves] in this matter, so the Court has cleared the courtroom. That person now is not present.

(Emphasis added). Neither the Commonwealth nor appellant disputed the trial court's characterization of the sidebar conference or its statement that counsel agreed that the witness indicated she felt threatened and intimidated.

- 4 -

Once the courtroom was cleared, Harris' testimony continued without incident. She verified much of her preliminary hearing testimony and indicated that it was true. She testified that appellant had exited the vehicle after firing shots into the air, that appellant had chased Harris and her companion, and that appellant had fired the gun in their direction. After Harris had been shot, she heard appellant tell Gleaves to make sure she was dead. Gleaves dutifully kicked Harris and mistakenly reported to appellant that Harris was dead.

Once the Commonwealth had concluded its redirect examination treating Harris as a hostile witness, appellant engaged in recross-examination. During this examination, Harris revealed that appellant's brother had offered Harris one thousand dollars if she refused to come to court.

At the conclusion of all of the evidence, the trial court, in denying appellant's motion to strike and in explaining its view of the evidence, gave a detailed statement about Harris' testimony. Specifically, the trial court stated that

> In the Court's estimation this case really does rise and fall with the credibility of the witnesses, and the alleged victim in this matter, Ms. Harris, upon her entry to court, through the first half of her testimony she is remarkably different than the person who ended up her testimony after the person who was identified as a relative or friend of the co-defendant left the courtroom.
>
> At times during her testimony she was crying. When she realized the Court was going to allow the Commonwealth to use her testimony at the preliminary hearing, she became visibly upset. Responding to the Court to allow counsel to inquire as to the basis for her discomfort, that's when it was revealed that that person was in the courtroom. So to say that situation and the atmosphere was ripe with intimidation would [b]e an understatement. Her demeanor upon that person leaving the courtroom was remarkably different. She was more open in talking about what had occurred.

Finding Harris' version of events after the courtroom had been cleared to be credible, the trial court convicted appellant of the above-stated offenses. This appeal follows.

ANALYSIS

Appellant challenges the trial court's determination that the Commonwealth was entitled to impeach Harris with prior inconsistent statements.[2] Specifically, appellant argues that the circumstances do not support a conclusion that the Commonwealth was surprised by Harris' testimony. Appellant further maintains that the Commonwealth failed to confront Harris with the substance of the alleged prior inconsistent statements or demonstrate that a prior inconsistent statement was made. Finally, appellant argues that the statements lacked probative value and were not injurious to the Commonwealth's case. The Commonwealth responds that it is apparent from the record that Harris' initial testimony surprised the Commonwealth, injured the Commonwealth's case, and occurred in an environment where she was clearly intimidated, and thus, the trial court correctly deemed her a hostile witness.

## I. Standard of Review

It is well established that

> [w]e review a trial court's ruling that a witness is a hostile witness under an abuse of discretion standard. The trial court determines whether a witness is hostile or adverse because "*the trial court sees and hears the witness on the stand, observes his demeanor, and hence is in a much better position to determine whether he is in fact adverse or hostile than is an appellate court which must rely on the printed record.*"

Teleguz v. Commonwealth, 273 Va. 458, 479, 643 S.E.2d 708, 722 (2007) (emphasis added) (internal citation omitted) (quoting Virginia Elec. & Power Co. v. Hall, 184 Va. 102, 105, 34 S.E.2d 382, 383 (1945)).

---

[2] Appellant does not challenge the trial court's decision to allow the Commonwealth to examine Harris as if conducting cross-examination, but rather, only challenges the Commonwealth's use of her preliminary hearing testimony to impeach her. As a result, the law of the case is that all of Harris' responses to leading questions asked by the Commonwealth that did not utilize the preliminary hearing testimony as prior inconsistent statements were properly before the trial court.

When evaluating whether a trial court has abused its discretion, we do not substitute our judgment for that of the trial court. Rather, we consider "only whether the record fairly supports the trial court's action." Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (quoting Beck v. Commonwealth, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997)). An abuse of discretion occurs only when reasonable jurists could not differ. Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005). Thus, if a reasonable jurist *could* conclude that the record supports a determination that Harris was a hostile witness, we must affirm.

## II. "Hostile" Witnesses

In most instances, a party calling a witness must conduct the examination consistent with the rules applicable to direct examinations. This precludes the use of leading questions. Furthermore, by calling the witness, a party generally adopts the witness as the party's witness. This further restricts the examination because, subject to limited exceptions, "a party may not impeach his own witness." John Crane, Inc. v. Jones, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007).

One such exception is if the witness is a hostile witness. A hostile witness is a witness who either has an interest in the case that is adverse to the party who calls the witness or is a witness whose testimony at trial proves to be adverse to the party that calls the witness. The first category of hostile witness is governed by Code § 8.01-401,[3] while the second is governed by Code § 8.01-403.

---

[3] Code § 8.01-401(A) provides that "[a] party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination." See also Va. R. Evid. 2:607(b). We again note that appellant does not challenge the trial court's decision to allow the Commonwealth to examine Harris "according to the rules applicable to cross-examination."

Code § 8.01-403, applicable in criminal as well as civil cases, provides that

> [a] party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall in the opinion of the court prove adverse, by leave of the court, prove that he has made at other times a statement inconsistent with his present testimony.

See also Va. R. Evid. 2:607(c).[4] Thus, the statute allows impeachment of a party's witness with prior inconsistent statements after that witness has been found by the trial court to be adverse. Ragland v. Commonwealth, 16 Va. App. 913, 920, 434 S.E.2d 675, 680 (1993). In this way, Code § 8.01-403 "codifies the ancient common law rule that, where a party's own witness has surprised the party by changing stories or becoming hostile on the stand, the party may show that the witness had made a prior statement inconsistent with the present testimony." Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 12-2, at 643 (7th ed. 2012); see Roberts v. Commonwealth, 230 Va. 264, 269-70, 337 S.E.2d 255, 259 (1985) (holding that witness proved adverse where prosecutor was "surprised by what [his own witness] said when he began testifying").

Although surprise is a necessary condition to allow a party to impeach its own witness, surprise standing alone, is insufficient. As the Virginia Supreme Court has stated,

> one is not permitted to impeach his own witness merely because the latter does not come up to his expectation. It is only when the testimony of the witness is injurious or damaging to the case of the party introducing him that the witness can be said to be adverse so as to justify his impeachment. If the testimony is of a negative character and has no probative value, there is no need to discredit the witness.

---

[4] We note that, in general, "[p]rior inconsistent statements admitted for impeachment may not be used to prove the truth of their contents." Wells v. Commonwealth, 32 Va. App. 775, 783, 531 S.E.2d 16, 20 (2000). Although appellant notes on brief that "the trial court relied on changes between Harris['] initial testimony and adverse [witness] testimony in convicting the [a]ppellant," she argues only that impeachment should not have been permitted. Accordingly, we do not address the question of whether the trial court impermissibly relied on the prior inconsistent statements as substantive evidence as opposed to mere impeachment.

Hall, 184 Va. at 105-06, 34 S.E.2d at 383; see also Ragland, 16 Va. App. at 920, 434 S.E.2d at 680.

### A. Harris' trial testimony surprised the Commonwealth

Appellant first contends that the Commonwealth failed to establish a sufficient foundation to allow Harris to be impeached by her prior inconsistent statements. Specifically, appellant argues that, given Harris' failure to appear at Gleaves' trial and her arriving late for appellant's trial, "the Commonwealth cannot reasonably claim surprise" regarding Harris' trial testimony. Appellant misunderstands the relevant inquiry.

The failure of Harris to appear at Gleaves' trial and failure to arrive timely at appellant's trial may have placed the Commonwealth on notice that Harris was a reluctant witness; however, neither the failure to appear nor the late arrival suggested what the content of her testimony ultimately would be. The appropriate question is not whether Harris *wanted* to testify; it is whether the *content* of her testimony was surprising. As the Virginia Supreme Court has recognized, "[t]he question is not whether the Commonwealth's Attorney was taken by surprise when [the witness] refused to testify but whether the prosecutor was surprised by what [the witness] said when he began testifying." Roberts, 230 Va. at 269, 337 S.E.2d at 259 (footnote omitted).[5] Given that Harris' initial trial testimony was markedly different from her preliminary hearing testimony and nothing in the record suggests that the Commonwealth was aware that

___

[5] See also Clatterbaugh v. Commonwealth, No. 0801-09-2, 2010 Va. App. LEXIS 289, at *23 (Va. Ct. App. July 27, 2010) ("Although the Commonwealth knew that [the witness] was reluctant to testify . . . , it did not know that [the witness] was going to recant her previous statement and now testify that the assailant was not [the defendant]. Accordingly, the trial court did not abuse its discretion by determining that the Commonwealth's witness had proven adverse and allowing the Commonwealth to impeach her with her prior inconsistent statement."). Unpublished opinions of this Court, while having no precedential value, are nevertheless persuasive authority. Otey v. Commonwealth, 61 Va. App. 346, 351 n.3, 735 S.E.2d 255, 258 n.3 (2012).

such a change in testimony was forthcoming, the trial court reasonably could conclude that the Commonwealth was surprised by the content of Harris' testimony.

B. The preliminary hearing testimony constituted prior inconsistent statements

Next, appellant argues that "[b]ecause Harris was the first witness produced by the Commonwealth, there is no record of an alleged prior statement inconsistent with her trial testimony until after the Court found that she proved adverse." Once again, this misunderstands the issue.

In general, impeachment with inconsistent statements will be accomplished with statements that occurred outside of the trial. In civil cases, pretrial depositions are routinely used to impeach witnesses whose trial testimony differs from their deposition testimony. Similarly, preliminary hearing testimony commonly is used to impeach trial testimony that differs from the testimony before the general district court. See, e.g., Roberts, 230 Va. at 268, 337 S.E.2d at 258 (recognizing with approval the use by the Commonwealth's Attorney of a preliminary hearing transcript to impeach a prosecution witness).

Code § 8.01-403 expressly recognizes that the prior statements will not necessarily have occurred during the trial. In pertinent part, it provides for the impeachment of one's own witness if the witness "*has made at other times a statement inconsistent with his present testimony*." (Emphasis added). Accordingly, the fact that Harris' initial trial testimony may have been internally consistent is irrelevant to the question of whether she had made prior inconsistent statements.

Furthermore, contrary to appellant's assertion, it was not only appropriate, but required, for the trial court to deem Harris a hostile witness before she was confronted with the inconsistent statements. Va. R. Evid. 2:607(c)(i) provides that "*[i]f a witness proves adverse*, the party who called the witness may, *subject to the discretion of the court*, prove that the witness

- 10 -

has made at other times a statement inconsistent with the present testimony as provided in Rule 2:613."[6]  In short, before a party's own witness can be impeached with a prior inconsistent statement, the trial court first must agree that the witness has proven adverse and then allow the party to proceed with the impeachment.  Accordingly, the trial court did not err in deeming Harris a hostile witness before allowing the Commonwealth to impeach her with the preliminary hearing testimony.

C.  Harris' initial trial testimony was injurious to the Commonwealth's case

Appellant also challenges the decision of the trial court to allow the Commonwealth to impeach Harris because "the inconsistencies [in Harris' trial testimony] had no probative value because they were neither injurious nor damaging to the Commonwealth's case in chief . . . [, and thus,] her trial testimony simply did not rise to the level of the Commonwealth's expectations."

As noted above, to be allowed to impeach its own witness, a party must demonstrate more than that it expected a witness to testify differently.  Only if the testimony is "injurious or damaging to the case of the party introducing him [can] the witness . . . be said to be adverse so as to justify his impeachment."  Hall, 184 Va. at 106, 34 S.E.2d at 383.

Utilizing the plain and ordinary meaning of "injurious or damaging to the case," it is clear that the differences between Harris' initial trial testimony and her preliminary hearing/ultimate trial testimony would be considered injurious or damaging to the Commonwealth's case.  Harris, the Commonwealth's only eyewitness and the victim of the shooting, stated at the preliminary

---

[6] Va. R. Evid. 2:613(a)(i) requires that, to properly impeach a witness with a prior oral statement, "the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and the witness must be asked whether the statement was made."  These requirements were satisfied in this case by the Commonwealth asking whether she remembered testifying under oath at the preliminary hearing and, after reading a portion of her testimony from the preliminary hearing, asking Harris if she remembered saying those things.

hearing that she saw appellant exit the vehicle and shoot towards her and that appellant was involved in the shooting to the point where she ordered Gleaves to confirm that Harris was dead. The change in story to having appellant only firing a few shots into the air, directing none of them at Harris, remaining in the car, and not ordering Gleaves to confirm the death would have dealt a serious, if not fatal, blow to the Commonwealth's case.

The decisions of Virginia's appellate courts, however, reveal that simply meeting the plain and ordinary definition of the phrase "injurious or damaging to the case" is insufficient to allow a party to impeach its own witness. For example, in Brown v. Commonwealth, 6 Va. App. 82, 366 S.E.2d 716 (1988), a prosecution witness testified that he did not know the defendant or his victim and that he had not witnessed the stabbing. Id. at 83, 366 S.E.2d at 717. The trial court allowed the Commonwealth to impeach the witness with his prior statement to police that he knew the defendant and the victim and that he had witnessed the stabbing. Id. We reversed the trial court, finding that the witness' testimony that "he did not know either [the defendant or victim] and did not see the stabbing had no probative value. It could not have assisted the trier of fact in determining . . . guilt or innocence. Having no probative value, it was not damaging or injurious to the Commonwealth's case." Id. at 86, 366 S.E.2d at 719.

Despite the obvious damage done to a case when the eyewitness who knew both the defendant and the victim changed his story to claim that he did not know or see anything, we based our conclusion on the notion that his new story was not affirmative evidence, but rather, was "of a negative character and [thus had] no probative value . . . ." Id. at 86, 366 S.E.2d at 718. Although the concept that testimony of a "negative character" cannot provide a basis for allowing impeachment of a party's own witness has been criticized,[7] it is a standard that has been

---

[7] See Friend & Sinclair, supra § 12-2, at 645 ("The view that 'negative' testimony is not or cannot be harmful is at best a questionable proposition.").

- 12 -

applied by Virginia's appellate courts on numerous occasions and has never been overruled. See, e.g., Hall, 184 Va. at 110, 34 S.E.2d at 385 (finding that "testimony was entirely negative in character and of no probative value"); see also Ragland, 16 Va. App. at 921, 434 S.E.2d at 680. Accordingly, we apply that standard here.

Harris' initial trial testimony was not of a negative character. She did not say that she could not remember or that she had not seen anything. Rather, she gave affirmative evidence placing appellant at the scene, possessing a gun, firing that gun, and being with Gleaves for at least some portion of the encounter. Although this may not have been sufficient evidence, in and of itself, to support a conviction beyond a reasonable doubt, it was affirmative evidence that was relevant to proving appellant's guilt or innocence. As such, the trial court did not err by allowing the Commonwealth to impeach Harris with her inconsistent preliminary hearing testimony.

D. The trial court's deeming Harris a hostile witness is further supported by the attempts to intimidate her

The evidence, as accepted by the trial court as factfinder, established that improper attempts were made to influence Harris' testimony if not to prevent it all together. From her clear reluctance to testify, to the need to clear the courtroom of a person whom Harris found threatening and intimidating, to the ultimate revelation that a relative of appellant had offered Harris one thousand dollars not to testify, the overwhelming evidence was that appellant and her cohorts were seeking to intimidate Harris. The trial court recognized that "the atmosphere was ripe with intimidation" and found that the attempts to intimidate Harris had a negative impact on her performance as a witness for the Commonwealth. These acts of intimidation improperly interfered with the "normal" examination of a prosecution witness by the Commonwealth, and

thus, provided additional support for the trial court's decision to deem Harris a hostile witness. Accordingly, we affirm the decision of the trial court.[8]

CONCLUSION

For the foregoing reasons, we find that the trial court did not abuse its discretion in allowing the Commonwealth to impeach Harris with her prior inconsistent statements, and therefore, we affirm appellant's convictions.

<u>Affirmed.</u>

---

[8] Even if the trial court had erred in its determination, we note that appellant challenges only the use of the preliminary hearing testimony to impeach Harris. No issue has been raised to the portions of the Commonwealth's redirect examination that relied on leading questions and made no reference to the preliminary hearing testimony. In responding to the leading questions, Harris gave substantive evidence sufficient to allow the trial court to conclude, beyond a reasonable doubt, that appellant had committed the charged offenses. Coupled with the trial court's express credibility findings, this testimony renders any alleged error in allowing Harris to be impeached with prior inconsistent statements mere harmless error. <u>Ragland</u>, 16 Va. App. at 921, 434 S.E.2d at 680.