COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges O'Brien, Ortiz and Raphael
Argued at Richmond, Virginia


JOHN E. NESTLER, M.D. AND
  STEPHANIE CALL, M.D.

v.        Record No. 0497-22-2

TIZIANO SCARABELLI, M.D.,
  HARRIS D. BUTLER, III AND
  BUTLER CURWOOD, PLC                                    OPINION BY
                                                    JUDGE DANIEL E. ORTIZ
TIZIANO M. SCARABELLI, M.D.                              MAY 2, 2023

v.        Record No. 0421-22-2

KENNETH ELLENBOGEN, M.D.,
  ANTONIO ABBATE, M.D.,
  STEPHANIE CALL, M.D. AND
  MCV ASSOCIATED PHYSICIANS


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Phillip L. Hairston, Judge

Charles M. Sims (Charles G. Meyer, III; Rachael L. Loughlin;
O'Hagan Meyer, PLLC, on briefs), for Kenneth Ellenbogen, M.D.,
Antonio Abbate, M.D., Stephanie Call, M.D., MCV Associated
Physicians and John E. Nestler, M.D.

L. Steven Emmert (Sykes, Bourdon, Ahern & Levy P.C., on briefs),
for Tiziano M. Scarabelli M.D., Harris D. Butler, III and Butler
Curwood, PLC.


When a party or an attorney files an objectively baseless defamation complaint, a trial court

must impose sanctions under Code § 8.01-271.1.  We apply this familiar principle to an acrimonious

disagreement between several litigants.  After hiring Dr. Tiziano Scarabelli, MCV Associated

Physicians ("MCVAP") began receiving complaints about Scarabelli's behavior, resulting in

intense litigation involving defamation, fraudulent inducement, and sanctions.  On appeal,

Drs. Stephanie Call and John Nestler argue that the trial court erred in denying their post-trial sanctions motions against Scarabelli and his attorney, Harris D. Butler, III, concerning Scarabelli's defamation claims and related litigation. Although Scarabelli's complaint against Call was objectively reasonable, his complaint against Nestler was baseless, as Nestler's alleged defamatory statements did not carry the requisite defamatory "sting." Thus, we affirm the trial court's denial of Call's motion for sanctions but reverse its denial of Nestler's motion for sanctions. On separate appeal, Scarabelli argues that the trial court erred in allowing MCVAP's fraudulent inducement counterclaim to go to the jury, claiming that the source of duty rule, voluntary payment doctrine, Virginia Wage Payment Act, and "*Gasque*" doctrine preclude such a claim. *See Gasque v. Mooers Motor Car Co.*, 227 Va. 154 (1984). Because the doctrines cited by Scarabelli do not apply, we affirm the jury's verdict on the fraudulent inducement claim.

BACKGROUND

MCVAP hired Scarabelli as the Virginia Commonwealth University ("VCU") Health Systems' Director of Cardio-Oncology on a one-year contract, from June 2017 to 2018. By winter, MCVAP had received several complaints from staff members concerning Scarabelli's lack of professionalism. Several MCVAP doctors believed that these misunderstandings were cultural[1] and attempted to counsel Scarabelli. MCVAP also received complaints from interns, residents, and patients that appeared to constitute allegations of sexual harassment, prompting a Title IX investigation referral. During the investigative process, MCVAP placed Scarabelli on administrative leave from February to June 2018. It continued to pay Scarabelli's salary—over $20,000 per month—during this time. Ultimately, MCVAP chose to not renew Scarabelli's contract.

---

[1] Referring to Scarabelli's Italian background.

Scarabelli filed a complaint against Drs. Kenneth Ellenbogen, Antonio Abbate, Nestler, Call, and MCVAP (collectively, "Defendants"), alleging that they defamed him because he questioned VCU's cardiac monitoring process.  In an amended complaint, Scarabelli alleged that Defendants falsely (1) attacked his professionalism and (2) alleged that he committed sexual misconduct with interns, residents, and fellows "to discredit [him], stop his concerns regarding the cardiac care of chemotherapy patients, and . . . ruin him professionally."  Scarabelli sought to prove that Call defamed him when she authored a January 2018 memorandum that stated in part:

- "There were some instances where he made some mildly uncomfortable comments to the female NP or patients which were a little inappropriate in nature . . . ."
- "From one trainee . . . :
    - 'When introducing himself and helping those around him correctly pronounce his name, he would say . . . "Tiziano . . . like tits (grabbing his chest) and ano (pointing to his anus)."'
    - 'I remember him stating that "blondes are for dating and brunettes are for marrying."'
    - 'I recall him being very touchy feely, including placing his hands on many of the resident's thighs, including my own.'
    - 'When going to the ED to see a new admission, the fellow and I escorted him down there since he was new and did not know how to get there.  Once we got to the ED he began speaking to a female care partner, roughly 20-24 years of age, and he then pursued to ask her for a tour.  While the fellow and I waited a few minutes for him to return, we asked what he was doing.  He said something along the lines of her being very attractive so he asked her to show him around.'
    - 'I also remember him mentioning that his wife is sexy a couple times.'"
- "I only worked with him for a few days.  It was the worst experience of my medical career . . . .  Everyone else told me that they felt sorry for me . . . .  He was rude; he constantly interrupted, correcting me and dressed me down in front of the team while I tried to present . . . .  He made me stand up in front of the entire team to 'act out' vectors for EKG reading and said 'no, not like that, put your hand on your chest . . . .'"
- "I have heard negative things about him from other attendings—that their patients complain about him being unprofessional and rude."

- "He is always putting down other physicians and our healthcare system."
- "He told the interns not to page him."
- "He made reference during rounds recurrently to 'my beautiful eyes'; it made me uncomfortable . . . . He touched my leg . . . . He made multiple inappropriate comments on rounds . . . . I felt like he tried to come on to me, like he was constantly staring at me . . . . He was constantly complaining about other attendings and making comparisons to past institutions, clearly stating that ours was inferior."

And Scarabelli sought to prove that Nestler defamed him in making the following statements:[2]

- "Based on multiple complaints raised against you by interns."
- "Concerns that were raised."
- "Multiple complaints have been raised."
- "Administrative leave."
- "Dr. Scarabelli was placed on administrative leave."

MCVAP counterclaimed, alleging that Scarabelli fraudulently induced his hiring. Specifically, MCVAP alleged that Scarabelli submitted a curriculum vitae that he knew "contained references to fraudulently procured articles published in medical . . . journals" and "purposefully concealed . . . the true circumstances" of his termination from the University of Alabama. MCVAP claimed it "would never have employed" Scarabelli had it known the truth.

Defendants filed a plea in bar and a demurrer to Scarabelli's amended complaint. On demurrer, Defendants argued, in part, that the statements by Call and Nestler were not actionable as defamation. After argument, the trial court overruled Defendants' renewed plea in bar and demurrer.

A six-day consolidated trial followed. After argument, Scarabelli moved to strike, arguing that MCVAP voluntarily paid his administrative leave and did not sufficiently quantify

---

[2] The parties provided a joint interrogatory chart that includes all alleged defamatory statements. The purpose of this chart was to "amplify the Amended Complaint."

- 4 -

its damages. MCVAP countered that their damages were properly quantified[3] and that the voluntary payment doctrine sounds in contract, not tort, and does not apply to fraudulent inducement claims. Defendants also moved to strike Scarabelli's defamation claims, arguing that the statements were true, did not have defamatory "sting," and were subject to a qualified privilege. Scarabelli countered that all the statements showed an intent to damage his reputation, due to his perceived lack of collegiality and cultural differences. Although the trial court took both matters under advisement, it ultimately refrained from addressing the motions to strike by joint request of counsel.

Because Scarabelli agreed to dismiss all defamation claims against Nestler, the jury considered only these issues: (1) Ellenbogen's alleged defamation per se, (2) Abbate's alleged defamation per se, (3) Call's alleged defamation per se, (4) MCVAP's alleged defamation per se, and (5) MCVAP's fraud in the inducement claims.[4] The jury returned a verdict against Scarabelli, finding that he failed to prove a prima facie defamation case against the above-named individuals. It ruled in favor of MCVAP on the counterclaim, awarding compensatory damages of $102,500 and punitive damages of $143,500.

Call and Nestler moved for post-trial sanctions on the defamation claims against them. Scarabelli also filed several post-trial motions, including a motion to set aside the verdict on the counterclaim and a motion for a new trial. The trial court denied all four motions and entered final judgment pursuant to the jury's verdict and its post-trial rulings. These appeals followed.

---

[3] Specifically, MCVAP quantified its damages when it stated that it hired Scarabelli but was unable to fully "utilize" him, as it had to "put him off to the side, but . . . continue to pay him" for five months. "And that's our damages, Your Honor. That's the damage we would not have incurred if we would not have hired him."

[4] The jury did not consider any defamation per quod issues. The court previously granted a motion in limine precluding introduction of special damages to support Scarabelli's per quod claims—effectively striking those claims—as Scarabelli "failed to timely provide the information in discovery."

ANALYSIS

On appeal, Call and Nestler argue that the trial court erred in denying their post-trial sanctions motions, stating that Scarabelli's defamation claims were baseless. On separate appeal, Scarabelli argues that the trial court erred in allowing MCVAP's fraudulent inducement counterclaim to go to the jury and in refusing to set aside the jury's verdict. We begin with Call and Nestler's appeal concerning Scarabelli's defamation claims and the denial of their post-trial sanctions motions. After examining the record, we find that Scarabelli's claim against Call was not objectively unreasonable but that Scarabelli's claim against Nestler was baseless and warranted sanctions. We then address Scarabelli's appeal of MCVAP's fraudulent inducement claim and conclude that the record supports the jury's verdict. Finally, we find MCVAP's damages were appropriate in tort.

## I. Call's and Nestler's Appeal

### a. Standard of Review

We review the imposition of sanctions under an abuse of discretion standard. *Williams & Connolly, L.L.P. v. People for Ethical Treatment of Animals, Inc.*, 273 Va. 498, 509 (2007). "A court always abuses its discretion when it makes an error of law." *Davenport v. Util. Trailer Mfg. Co.*, 74 Va. App. 181, 206 (2022). It may also abuse its discretion by: (1) ignoring "a relevant factor that should have been given significant weight," (2) "considering and giving significant weight to an irrelevant or improper factor," and (3) "committing a clear error of judgment, even while weighing 'all proper factors.'" *Id.* (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013)). "We employ an 'objective standard of reasonableness' in evaluating the written representations" in the motions and pleadings filed with the trial court. *Williams & Connolly*, 273 Va. at 510. "On appeal, we view the evidence in the light most favorable to . . . the party prevailing below"—here, Scarabelli. *Black v. Powers*, 48 Va. App. 113, 119 (2006).

Finally, our appellate review of defamation consists of two steps.  First, we look at whether the defamatory statement was actionable.  Whether an alleged defamatory statement is actionable is a question of law to be reviewed de novo.  *Jordan v. Kollman*, 269 Va. 569, 576 (2005).  A statement is not actionable if it "does not contain a provably false factual connotation," *id.* (quoting *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132 (2003)), or if it does not contain the requisite defamatory "sting," *Schaecher v. Bouffault*, 290 Va. 83, 92 (2015).  Second, we look at whether the evidence—viewed in the light most favorable to the prevailing party below—could have supported a jury's finding that the challenged statements were false.  *Jordan*, 269 Va. at 576.  "Thus, on appeal, we determine only whether there is sufficient evidence to support the jury's decision.  A trial court's judgment will not be set aside unless it is plainly wrong or without evidence to support it."  *Id.*

### b.  Call and Nestler's Assignments of Error

Call and Nestler argue that the trial court erred in denying their motions for sanctions, as their alleged defamatory statements were true and lacked both malice and defamatory "sting." Thus, they argue that Scarabelli's claims lacked legal merit and warranted sanctions.  Because Scarabelli's amended defamation complaint against Call was not objectively unreasonable, Call's appeal fails.  Conversely, Scarabelli's amended defamation complaint against Nester was baseless and violated Code § 8.01-271.1 and the trial court erred in denying Nestler's motion for sanctions.

    i.  <u>The trial court did not abuse its discretion in denying Call's motion for sanctions.</u>

In defamation[5] cases, a plaintiff must show: "(1) publication of (2) an actionable statement with (3) the requisite intent."  *Jordan*, 269 Va. at 575.  Actionable defamation is "both

---

[5] Written defamation is libel; spoken is slander.  *Jordan*, 269 Va. at 575.  We make "no distinction between" libel and slander.  *Fleming v. Moore*, 221 Va. 884, 889 (1981).

false," *id.*, and contains "defamatory 'sting,'" *Schaecher*, 290 Va. at 92. True statements and opinions are not actionable. *Jordan*, 269 Va. at 575-76. Language contains defamatory sting when it: harms "one's reputation in the common estimation of mankind"; vilifies, shames, or disgraces; tends to cause "scorn, ridicule, or contempt"; or "is calculated to render [the subject] infamous, odious, or ridiculous." *Schaecher*, 290 Va. at 92. We give "allegedly defamatory words . . . their plain and natural meaning[,] . . . to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954).

An attorney's signature on a pleading, motion, or other paper "constitutes a certificate" that "(i) he has read the pleading," "(ii) to the best of his knowledge," and "after reasonable inquiry," he finds that "it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," and (iii) "is not interposed for any improper purpose." Code § 8.01-271.1. And again, "[w]e employ an 'objective standard of reasonableness'" when evaluating a party's "written representations." *Williams & Connolly*, 273 Va. at 510. Thus "we consider whether 'after reasonable inquiry, [counsel] could have formed a reasonable belief that the pleading[s] [were] well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and not interposed for an improper purpose.'" *Id.* (alterations in original) (quoting *Flippo v. CSC Assocs. III, L.L.C.*, 262 Va. 48, 65-66 (2001)).

The Supreme Court has stated that if Code § 8.01-271.1 is violated, the trial court must impose sanctions because the statute uses the words "shall impose." *N. Virginia Real Est., Inc. v. Martins*, 283 Va. 86, 114 (2012). Our Code § 8.01-271.1 is based on the 1983 version of Rule 11 of the Federal Rules of Civil Procedure, as is evidenced by the similar language of Code § 8.01-271.1 and its lack of substantive amendment since 1987. *See* Code § 8.01-271.1(D) ("If a

pleading, motion, or other paper is signed or made in violation of this section, the court, upon motion or upon its own initiative, shall impose upon the person who signed the paper or made the motion, a represented party, or both, an appropriate sanction . . . [including] the reasonable expenses incurred because of the filing . . . [and/or] reasonable attorney fees.")  In 1983, Federal Rule 11 "oblig[ated] [the district court] to impose sanctions once it determined that a signer had violated Rule 11 . . . [as] 'the court shall impose' sanctions if a violation has occurred." Benjamin Spencer, *Federal Practice & Procedure* (Wright & Miller) § 1331 (2022 update).  In 1993 and 2007, Rule 11 was amended again.  *See* Fed. R. Civ. P. 11.  As a result of the 1993 amendment, its language was changed from obligatory to permissive, now stating that the court "may" impose sanctions if it finds that Rule 11 was violated.  *See* Fed. R. Civ. P. 11. Recognizing this, our Supreme Court stated: "the General Assembly had the opportunity to make discretionary a court's imposition of sanctions upon finding a statutory violation, but elected not to do so.  Instead, it used the mandatory words '*shall* impose.'"  *Martins*, 283 Va. at 114.

Thus, we must first determine whether Scarabelli presented a valid defamation claim against Call.  To do so, Scarabelli and his attorney must have complained that Call published, with malintent, a false statement containing defamatory sting, *see Jordan*, 269 Va. at 575, and must have included more than mere conclusory allegations, *see A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 613 (2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *Dean v. Dearing*, 263 Va. 485, 490 (2002).  If they failed to present a proper and well-grounded defamation case in the amended complaint, motions, discovery, and other papers, we must then determine whether Scarabelli and his attorney violated Code § 8.01-271.1.  Finally, if Scarabelli and his attorney violated Code § 8.01-271.1, the trial court abused its discretion in denying sanctions.

Viewed in the light most favorable to the prevailing party—Scarabelli—the trial court did not abuse its discretion in denying Call's sanctions motion. Because Scarabelli and his attorney presented a valid, non-conclusory defamation claim against Call that appeared well-grounded in fact, they did not violate Code § 8.01-271.1. *See Jordan*, 269 Va. at 575 (requiring "(1) publication of (2) an actionable statement with (3) the requisite intent" in defamation claims).

Here, Call published the January 2018 memorandum to several staff members. In the memorandum, she restated—verbatim—several allegations that Scarabelli had sexually harassed patients and staff and lacked professionalism. Call's statements were vivid, not opinion, and contained sufficient sting to harm Scarabelli's "reputation in the common estimation of mankind." *Schaecher*, 290 Va. at 92. Because Scarabelli vehemently denied these allegations, reasonable people could differ as to the veracity of these statements. For example, Call restated complaints like:

- "He was rude; he constantly interrupted, correcting me and dressed me down in front of the team while I tried to present . . . . He made me stand up in front of the entire team to 'act out' vectors for EKG reading and said 'no, not like that, put your hand on your chest . . . .'" and
- "He made reference during rounds recurrently to 'my beautiful eyes'; it made me uncomfortable . . . . He touched my leg . . . . He made multiple inappropriate comments on rounds . . . . I felt like he tried to come on to me, like he was constantly staring at me . . . ."

As such, the truth of Call's statements in the January 2018 memorandum was a proper question for the jury, despite Call's contention to the contrary. Lastly, Scarabelli's testimony that he believed Call's memorandum was made with malintent, in retaliation for his concerns about VCU's cardiac monitoring processes, was a proper question of credibility for the jury. For these reasons, we cannot say that Scarabelli's claims against Call were "objective[ly]" unreasonable,

*Williams & Connolly*, 273 Va. at 510, were not "well grounded in fact," or were "interposed for an[] improper purpose," Code § 8.01-271.1.

While the jury rejected the claims against Call, Scarabelli presented a valid defamation claim against Call with sufficient evidentiary support. As such, Scarabelli and his attorney did not violate Code § 8.01-271.1, and the trial court did not abuse its discretion in denying Call's motion for sanctions.

    ii.  <u>The trial court abused its discretion in denying Nestler's motion for sanctions.</u>

Even viewed in the light most favorable to Scarabelli, the trial court abused its discretion in denying Nestler's motion for sanctions. As previously stated, we must first determine whether Scarabelli and his attorney presented a valid defamation claim against Nestler in the amended complaint, motions, discovery, and other papers. To present a valid defamation complaint against Nestler, Scarabelli and his attorney must have complained that Nestler published, with malintent, a false statement containing defamatory sting and must have presented more than mere conclusory allegations. *See Jordan*, 269 Va. at 575. If Scarabelli and his attorney failed to present a prima facie, non-conclusory defamation claim against Nestler, we must then determine whether they violated Code § 8.01-271.1. And, lastly, if Scarabelli and his attorney violated that code section, the trial court abused its discretion in denying sanctions.

Here, Scarabelli failed to present a valid defamation claim against Nestler, as Scarabelli could not provide a single actionable defamatory statement made by Nestler or present any evidence at trial that Nestler defamed him. One month before filing the amended complaint, Scarabelli was deposed and admitted that Nestler made no defamatory statements. Rather, Scarabelli was upset about Nestler's *actions*:

> A:    [I]n a nutshell, what Nestler did . . . it would be difficult for me to come up with a specific sentence.
>
>    . . . .

- 11 -

Q: Okay. So I understand you cannot give or, come up with a specific sentence, or words that Dr. Nestler used that were false and defamatory, but your issue with him was his actions enabled the ultimate termination of your employment, the nonrenewal of your contract?

A: Yes.

. . . .

Q: Okay. So you would agree you don't have any particular defamatory words that he said, but your issue with Dr. Nestler is his actions?

A: The action and the fact that he didn't . . . try to find a remedy for the wrong which had been done until that point.

Nevertheless, only one month later, Scarabelli and his counsel filed an amended complaint, alleging that Nestler uttered five defamatory statements: (1) "based on multiple complaints raised against you by interns," (2) "concerns that were raised," (3) "multiple complaints have been raised," (4) "administrative leave," and (5) "Dr. Scarabelli was placed on administrative leave."

Several of these statements were undeniably true and, therefore, not actionable. *Jordan*, 269 Va. at 575-76. Scarabelli does not contest that he was placed on administrative leave. Instead, he argues that he should not have been placed on administrative leave because it was retaliatory. But whether Scarabelli's administrative leave was unjust is not at issue here, only whether Nestler's statements were defamatory. Because true statements cannot be defamatory, statements (4) and (5) cannot constitute actionable defamation. We note that the other statements appear equally true, as Scarabelli never challenged the *fact* that complaints were made, only the content and veracity of those complaints.

Alternatively, none of the above statements contain the requisite defamatory sting. Therefore, they were not actionable. As stated above, language contains defamatory sting when it: harms "one's reputation in the common estimation of mankind"; vilifies, shames, or disgraces; tends to cause "scorn, ridicule, or contempt"; or "is calculated to render [the subject] infamous, odious, or ridiculous." *Schaecher*, 290 Va. at 92. We give "allegedly defamatory words . . .

- 12 -

their plain and natural meaning[,] . . . to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile*, 196 Va. at 7. "[B]efore allowing the matter to be presented to a finder of fact," courts "must decide as a threshold matter . . . whether a statement is reasonably capable of defamatory meaning." *Schaecher*, 290 Va. at 94.

In *Schaecher*, the Supreme Court held that a local planning commissioner's comment that an applicant seeking to build a dog kennel "was not totally truthful" did not contain defamatory sting. *Id.* at 101-02. But it held that the statement "I firmly believe that [she] is lying and manipulating facts to her benefit" contains defamatory sting, as this statement could be reasonably understood as an attack on the applicant's reputation and character. *Id.* at 101. In *Bryant-Shannon v. Hampton Roads Cmty. Action Program, Inc.*, 299 Va. 579 (2021), the Supreme Court held that a supervisor's statements in a disciplinary letter did not contain defamatory sting when those comments merely instructed an employee to change her unprofessional behavior. *Id.* at 587-88 (stating, for example, "[y]ou are not allowed to take sick leave without giving notice to your immediate supervisor prior to the start of the work day . . ."); *see also Theologis v. Weiler*, 76 Va. App. 596, 605-08 & n.6 (2023) (finding that twenty-six allegedly defamatory statements lacked sufficient sting to be actionable).

Here, Nestler's statements could not be construed as an attack on Scarabelli's reputation or character, as none of these statements are "reasonably capable of defamatory meaning." *See Schaecher*, 290 Va. at 94. Like the statements in *Bryant-Shannon*, Nestler's statements constituted mere observations. As such, Nestler's statements contained no defamatory sting on their face and were not actionable defamation. Moreover, Scarabelli and his counsel appeared to recognize the utter lack of merit in the defamation claims against Nestler—either for truthfulness

- 13 -

or lack of defamatory sting—as they quietly agreed to remove the claim against Nestler from the jury's consideration.

Although sanctions should not be awarded lightly, sanctions must be awarded in certain circumstances under Code § 8.01-271.1(D). This case is one of those rare circumstances. One month after Scarabelli stated, under oath, that he could not identify any defamatory statements made by Nestler, Scarabelli—by and through his attorney—filed an amended complaint stating, again, that Nestler defamed him. The amended complaint contained no reasonable, actionable defamatory statements by Nestler. Despite Scarabelli's inability to identify any defamatory statement made by Nestler and the utter lack of defamatory sting, Scarabelli and his attorney nevertheless certified that the amended complaint was "well grounded in fact" and "not interposed for any improper purpose." Code § 8.01-271.1. They then forced Nestler to litigate for several years and participate in a six-day trial, only to drop the case against Nestler at the last minute because their claim was clearly not well-grounded in fact. Under an "objective standard of reasonableness," both Scarabelli and his attorney violated Code § 8.01-271.1 in filing the amended complaint, motions, and other papers concerning Nestler and in litigating against him for several years. *See Williams & Connolly*, 273 Va. at 510.

As previously stated, when Code § 8.01-271.1 is violated, the trial court *must* "impose upon the person who signed the paper or made the motion, a represented party, or both, an appropriate sanction." Code § 8.01-271.1(D); *Martins*, 283 Va. at 114. Because Scarabelli's claims against Nestler were clearly not "well grounded in fact" and/or were "interposed for an[] improper purpose," Code § 8.01-271.1, the trial court erred in failing to impose sanctions against Scarabelli and/or his attorney.[6] Finally, we note that although the imposition of sanctions was

_____

[6] We are unable to evaluate the trial court's reasoning further, as it did not explain its reasoning when denying Nestler's motion for sanctions.

mandatory here, the trial court retains discretion to determine the scope of the sanctions on remand. *See* Code § 8.01-271.1(D).

## II. Scarabelli's Appeal

### a. Standard of Review

"[W]hether a legal duty in tort exists is a pure question of law to be reviewed de novo." *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 79 (2019). We view the evidence and all reasonable inferences "in the light most favorable" to the prevailing litigant—here, MCVAP. *Bitar v. Rahman*, 272 Va. 130, 137 (2006). Regarding Scarabelli's wage violation claims, statutory interpretation is a matter of law which we review de novo. *See Montgomery v. Commonwealth*, 75 Va. App. 182, 189 (2022).

Additionally, a jury verdict will not be set aside on appeal unless "plainly wrong or without evidence to support it." *Bitar*, 272 Va. at 137. A trial court "must accord the jury verdict the utmost deference." *21st Century Sys., Inc. v. Perot Sys. Gov't Servs., Inc.*, 284 Va. 32, 41 (2012). It "may not substitute its conclusion for that of the jury merely because [it] disagrees with the result." *Id.* at 42. The United States Supreme Court has detailed the historical purpose of our deference to jury verdicts:

> The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.
>
> In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty.

*Pena-Rodriguez v. Colorado*, 580 U.S. 206, 210 (2017). Jury verdicts approved by the trial court are "the most favored position known to the law." *Bitar*, 272 Va. at 137. We view the evidence "in the light most favorable" to prevailing litigants, and approved jury verdicts will not be set aside unless "plainly wrong or without evidence to support it." *Id.*

The Supreme Court of Virginia is equally deferential to jury damage awards. "There is no fixed standard for measuring compensatory damages, and the amount of the award is largely a matter of [jury] discretion . . . based on the facts and circumstances of each" case. *Gazette, Inc. v. Harris*, 229 Va. 1, 41 (1985). Punitive damages are subject to "the jury's discretion because there is no set standard for determining the amount of punitive damages." *Coalson v. Canchola*, 287 Va. 242, 249 (2014). Unless the award "is so excessive as to shock the conscience . . . or to create the impression that the jury was influenced by passion or prejudice, a verdict approved by the trial court will not be disturbed on appeal." *Gazette*, 229 Va. at 41; *Coalson*, 287 Va. at 249.[7]

### b. Scarabelli's Assignments of Error

Scarabelli argues that MCVAP's counterclaim sounds in contract and is precluded by the source of duty rule, voluntary payment doctrine, Virginia Wage Claim Act, and "*Gasque*" doctrine. He claims that the contractual nature of MCVAP's counterclaim is shown by the damages, as MCVAP sought only the compensatory value of Scarabelli's employment contract. MCVAP counters that its fraudulent inducement claim sounds in tort. Because the damages sought by MCVAP were appropriate in tort and the record supports the jury's verdict, Scarabelli's arguments fail.

---

[7] For example, in personal injury cases, damages are inadequate if the jury awards "the exact amount of [the] claimed medical and special damages." *Jenkins v. Pyles*, 269 Va. 383, 390 (2005).

- 16 -

i. The source of duty rule does not bar MCVAP's counterclaim, as the counterclaim sounds in tort.

Under the source of duty rule, a violated duty arising from contract sounds in contract, but a violated duty arising "irrespective of a contract" sounds in tort. *S. Wallace Edwards and Sons, Inc. v. Selective Way Ins. Co.*, 2019 WL 6041123, at *2 (Va. Nov. 14, 2019) (quoting *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998)). The source of duty rule "has no application to a claim of fraudulent inducement of a contract," *id.*, as such claims "logically preexist before the contract [was] allegedly induced and thus stand as a viable tort claim," *Tingler*, 298 Va. at 82 n.11.

The five elements of fraud in the inducement are: (1) "false representation," (2) "of a material fact," (3) which induces the contract, (4) "on which the [other party] had a right to rely," *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362 (2010), and (5) results in damages, *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (2005). On appeal, Scarabelli challenges only the fifth element—the damages alleged by MCVAP. He claims that the damages sought are compensatory, thereby converting its tortious fraudulent inducement action into a contractual claim. Scarabelli's argument fails because the damages sought against Scarabelli are actual damages for his material fraudulent misrepresentations that induced MCVAP to contract.

Generally, "damages for breach of contracts are limited to the pecuniary loss sustained." *Dunn Const. Co. v. Cloney*, 278 Va. 260, 266 (2009) (quoting *Kamlar Corp. v. Haley*, 224 Va. 699, 705 (1983)). Contract damages "are subject to the overriding principle of compensation. They are within the contemplation and control of the parties in framing their agreement . . . [and] are limited to those losses which are reasonably foreseeable when the contract is made." *Kamlar*, 224 Va. at 706.

Meanwhile, tort damages are intended to compensate a "plaintiff for all losses suffered by . . . the defendant's breach of some duty imposed by law to protect the broad interests of social

- 17 -

policy. To further protect those interests, punitive damages may be awarded . . . to punish the wrongdoer and to deter similar conduct." *Id.* In a tortious fraudulent inducement action, the actual damages include, at the very least, a portion of the contract's value. Specifically, recipients of fraudulent misrepresentation may recover: "the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) *the difference between the value of what he has received . . . and its purchase price . . .* and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." *Restatement (Second) of Torts* § 549 (1977) (emphasis added).

Scarabelli overlooks that contract and tort damages may, and often do, overlap. *See id.*; *Dunn Const. Co.*, 278 Va. at 266-67 (citing *Foreign Mission Bd. v. Wade*, 242 Va. 234, 241 (1991)); *see generally Kamlar*, 224 Va. 699. Although we do not award punitive, non-economic damages in pure contract actions, the inverse—awarding compensatory damages in tort actions—is not precluded. This is because contract damages are limited to economic damages, and tort actions often include such damages. Indeed, fraudulent misrepresentation specifically allows defendants to receive their economic losses. *See Restatement (Second) of Torts* § 549, *supra*.

Here, MCVAP asked for—and received—damages amounting to five months of Scarabelli's salary. Scarabelli's contract ran from June 2017 to June 2018, and he was placed on paid leave at the end of January 2018. MCVAP is entitled to recover its economic loss for Scarabelli's fraudulent inducement, including the difference between what MCVAP received and what it paid, as well as any other loss "suffered otherwise as a consequence of" their reliance on his misrepresentation. *See id.* MCVAP received seven months from Scarabelli before he was placed on paid leave. As such, the difference between what MCVAP received and Scarabelli's contract value is exactly five months of Scarabelli's salary.

The jury then awarded seven months of Scarabelli's salary to MCVAP as punitive damages. Again, punitive damages are intended to punish the wrongdoer and deter future misconduct, *Kamlar*, 224 Va. at 706, and we give jury verdicts and jury damage awards "the utmost deference," *21st Century Sys.*, 284 Va. at 41. Scarabelli cries foul because these damages made him an "involuntary volunteer." Yet, this appears to be precisely what the jury intended— one year's pay to deter Scarabelli and others from lying on employment applications, especially those focused on treating vulnerable patients. Finally, Code § 8.01-38.1 limits recovery on punitive damages to $350,000. The jury's punitive damages award is well-within that limit.

The jury's damage award to MCVAP is consistent with our precedent and well supported by the evidence. Scarabelli does not argue that MCVAP improperly stated a claim for tortious fraudulent inducement to contract, and the record supports this verdict. We hold that the jury's damage award sounded in tort and the source of duty rule does not apply.

   ii. <u>The voluntary payment doctrine does not bar the counterclaim, as it sounds in tort and the voluntary payment doctrine does not apply to fraud.[8]</u>

Under the voluntary payment doctrine, "absent a showing of fraud or other misconduct," claimants cannot "demand that a court *return* money" that they "*voluntarily* paid to another." *Sheehy v. Williams*, 299 Va. 274, 278 (2020). In other words, "if one voluntarily makes a payment which *the law would not compel him to make*, he cannot afterwards assign his ignorance of the law as a reason why the state should furnish him with legal remedies to recover it." *Id.* at 278-79. Additionally, the party paying the "illegal demand" must do so "with a full knowledge of all the facts which render such demand illegal." *D.R. Horton, Inc. v. Bd. of Supervisors for Cnty. of Warren*, 285 Va. 467, 472 (2013). The voluntary payment doctrine does not apply to fraud. *See Sheehy*, 299 Va. at 278. We have concluded that Defendants properly pleaded, and

---

[8] We incorporate our above finding that MCVAP's claims sounded in tort, not contract, in the remainder of our discussion.

- 19 -

proved, a claim for tortious fraudulent inducement. Thus, the voluntary payment doctrine does not apply.

       iii.  <u>The Wage Payment Act does not bar the counterclaim, as Scarabelli was properly paid and the Act does not protect employees from their own fraud.</u>

The Virginia Wage Payment Act governs when and how employers must pay their employees and how wages may be withheld or forfeited. *See* Code § 40.1-29. Employers who fail "to make payment of wages . . . shall be liable for the payment of all wages due." Code § 40.1-29(G). The purpose of this statute is to protect employees from bad acting employers. The purpose of this statute is *not* to ensure that employees always receive wages, even if they commit fraud. *See, e.g.*, Code § 40.1-29(E) (An employer who "refuses to pay wages [is guilty of a crime] . . . *unless* the failure to pay was because of a bona fide dispute between the employer and its employee" (emphasis added)).

This statute does not apply here. Defendants paid Scarabelli his full salary and did not withhold wages. A jury subsequently found Scarabelli liable for the value of five months of his salary, due to his fraudulent inducement, and it found Scarabelli separately liable for the value of seven months of his salary, as punishment for his actions. Although Scarabelli argues that such punitive damages are contrary to Virginia law and public policy, this award comports with Code § 8.01-38.1. Scarabelli's wage argument fails.

       iv.  <u>The doctrine precluding punitive damages in contract actions does not apply to the counterclaim, as it sounds in tort.</u>

Generally, "tort cases require[] an award of actual damages as a prerequisite to an award of punitive damages." *Newspaper Pub. Corp. v. Burke*, 216 Va. 800, 805 (1976). Additionally, "[p]unitive damages are unavailable in suits purely *ex contractu*, and can be awarded only where an independent, wilful tort is alleged and proved." *Gasque*, 227 Va. at 159. In contract cases where an independent and willful tort is proved, "an award of compensatory damages . . . is

- 20 -

[generally] an indispensable predicate for an award of punitive damages." *Id.* Scarabelli argues that the punitive damages award depends on an invalid compensatory award. Because we find that the jury's award was a proper actual damages award, this argument fails.

    *c. Furthermore, the trial court should be affirmed, as approved jury verdicts and damage awards are given the utmost deference.*

As stated above, jury verdicts and jury damage awards enjoy "the utmost deference." *21st Century Sys.*, 284 Va. at 41. Approved jury verdicts are "the most favored position known to the law." *Bitar*, 272 Va. at 137. We view the evidence and all reasonable inferences "in the light most favorable" to prevailing litigants—here, MCVAP. And we will not set aside a jury's damage award unless it is plainly wrong and "so excessive as to shock the conscience." *Gazette*, 229 Va. at 41; *Coalson*, 287 Va. at 249.

Scarabelli seeks to peer inside the jury's black box—ignoring the fact that the jury was polled and reaffirmed its unanimity—and scramble the results until he is satisfied. The record supports the jury's verdict. We decline to rewrite the results.

## CONCLUSION

For the above reasons, we find that MCVAP's counterclaim sounded in tort and that the record supports the jury's verdict. Thus, we affirm the jury's verdict finding no defamation by the named individuals. We also affirm the trial court's denial of Call's motion for sanctions. But we reverse the trial court's denial of Nestler's motion for sanctions against both Scarabelli and his attorney, Harris D. Butler, III, and we remand for an entry of an order consistent with this decision after a hearing on the appropriate sanctions due.

    *Affirmed in part, reversed and remanded in part.*